Filed 4/28/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CYPRESS SEMICONDUCTOR CORPORATION,<br><br>        Plaintiff and Appellant,<br><br>              v.<br><br>MAXIM INTEGRATED PRODUCTS, INC., et al.<br><br>        Defendants and Respondents. | H038555<br>(Santa Clara County<br> Super. Ct. No. 1-11-CV202605) |

Plaintiff Cypress Semiconductor Corporation (Cypress) brought this action alleging that defendant Maxim Integrated Products, Inc. (Maxim), had misappropriated a trade secret, or was in the process of doing so, by seeking to hire away specialists in touchscreen technology, a field in which Cypress and Maxim compete. Maxim responded that it was entitled to solicit prospective employment candidates in Cypress's workforce and that there was no evidence it had acquired, or was seeking to acquire, any trade secret. After failing to secure temporary injunctive relief, and failing to obtain an order placing under seal evidence derived by Maxim from public sources, Cypress dismissed the action. The trial court awarded Maxim its attorney fees pursuant to Civil Code section 3426.4 (§ 3426.4), which authorizes such an award to the prevailing party where a claim for misappropriation of trade secrets is found to have been made in bad faith. Cypress contends that this was error because the trial court could not properly find that Maxim was the prevailing party, or that Cypress brought the action in bad faith. We

have concluded that (1) the trial court's findings are free of procedural error; (2) the finding of bad faith is amply supported by evidence that defendants did no more, and Cypress accused them of no more, than attempting to recruit the employees of a competitor, which Maxim was entitled to do under the laws of this state; and (3) Maxim prevailed when, as the trial court impliedly found on substantial evidence, Cypress dismissed the suit to avoid an adverse determination on the merits. Accordingly, we will affirm the judgment.

**BACKGROUND**

## A. Pre-Suit Events

Uncontradicted declarations established that in February 2011 Maxim was seeking to fill several positions, at least some of which required experience with touchscreen technology. Toward that end it engaged, among others, a recruiter named Zion Mushel, who operated out of Israel. On or shortly before February 9, 2011, Mushel sent an e-mail to a Cypress employee whom the parties have identified only as "Employee No. 60**" or "EE No. 60**," and to whom we shall refer as Employee 60XX. This was at least the third contact between Maxim and Employee 60XX. Mushel had exchanged e-mails with him in June 2010 concerning an opening for a "Business Manager/director Touch Interface Products" at Maxim's headquarters in San Jose. Later, in January 2011— apparently on his own initiative—Employee 60XX had e-mailed a contact at Maxim about an opening for an "FAE," apparently meaning a field applications engineer, in Austin, Texas. Now, on February 9, 2011, Mushel apparently sent Employee 60XX an email concerning another headquarters opening.[1] Employee 60XX replied, "I received

---

[1] Mushel's initial February 2011 e-mail does not appear in the record. Instead Cypress presented what appears to have been his June 2010 message to Employee 60XX. The initial February message was probably similar to this; his opening messages all tended to take substantially the same form, which the June 2010 message exemplifies: "I'm a global head hunter . . . . [¶] Can you help me? [¶] I'm looking for successful, leading 1st tier Semiconductors company for: [¶] Business Manager/director Touch

2

your email about the touchscreen business manager position.  My profile is up on linkedin, so you can see I am certainly qualified.  First question though . . . is this for Maxim?  I have spoken to the[m] previously about an opening for touchscreen business manager.  [¶]  Let me know and we can discuss further."  (Ellipsis in original.)  Mushel replied, "Yes, [i]t['s] again them  [¶]  Can you recommend anyone from Cypress or others?  [¶]  Can you recommend me: Member of Technical Staff: MTS, SMTS, PMTS, or scientist as well?  [¶]  I appreciate your help."

Cypress ultimately presented copies of e-mail exchanges assertedly showing that from February through April 2011, Mushel had "solicited at least nine Cypress employees who specialize in the touchscreen field."[2]

On April 6, 2011, Cypress president T. J. Rodgers wrote to Maxim president Tunç Doluca accusing Maxim of "seeking to obtain Cypress's proprietary information illegally by targeting Cypress employees skilled in touchscreen technology."  He warned that "[i]f Maxim persists in these actions, Cypress will sue Maxim and enjoin it from creating or distributing any products using any touchscreen expertise obtained from Cypress through former employees."  This was followed by an exchange of letters and e-mails in which Doluca disclaimed any interest in Cypress's touchscreen technology while Rodgers continued to insist that Maxim was engaging in conduct that could lead to litigation.  In a letter dated April 18, 2011, Rodgers complained that Employee 60XX, whom he described as "a 14-year Cypress employee with intimate knowledge of all of Cypress's touchscreen trade secrets," had accepted an offer of employment from Maxim.  After

---

Interface Products  [¶]  Must have experience as touchscreen applications business manager/technical marketing /product manager /PLM  [¶]  Location is in the Silicon Valley, CA  [¶]  Package is very attractive!!!  [¶]  People from Cypress are very suitable [¶]  Are you interested?  [¶]  Can you recommend anyone?  [¶]  I appreciate your help."

[2]  Since all identifying information has been redacted from these messages, it is impossible to verify the number of recipients.

arguing that hiring Employee 60XX could "contaminate Maxim's own touchscreen intellectual property," Rodgers wrote, "We are currently performing an internal investigation to determine if [Employee 60XX] was contacted by a headhunter hired by Maxim to recruit Cypress touchscreen people. If he was unlawfully recruited, I will follow through on my written promise and immediately file a lawsuit to enjoin Maxim from recruiting and hiring Cypress employees with touchscreen expertise." Doluca replied in e-mail, stating in part that Maxim's offer to Employee 60XX "was generated in March, before I received your first letter. More importantly, he was hired into a field applications engineering position in the US where he will not be working on touch technology at all. I will make sure he does not contaminate our touch technology." On May 12, Rodgers replied stating that Employee 60XX had "chosen to remain at Cypress." He continued to accuse Maxim of wrongful conduct, incorporating in the letter purported facsimiles of the e-mail exchanges between Mushel and Employee 60XX.[3] Rodgers asserted that these messages directly contradicted Doluca's denials by showing that Mushel had "contacted [Employee 60XX] for a touchscreen job."[4] (Italics and boldfacing removed.)

---

[3] In addition to omitting Mushel's initial February message, Rodgers omitted an important part of Employee 60XX's message of June 21, 2010. The employee had written, "Who is the company looking? *I may have talked to them already*." (Italics added.) The second sentence does not appear in the purported facsimile of the message contained in Rodgers's letter.

[4] Of course, elementary logic tells us that an assertion that a candidate was "contacted" for a "touchscreen job" does not contradict a statement that he was *offered* a non-touchscreen job. In fact it appears that both happened—Mushel indeed contacted Employee 60XX for a touchscreen position, but the position actually offered was the FAE position about which Employee 60XX had inquired on his own initiative three weeks before Mushel's contact.

4

### B. Suit Against Mushel

On May 13, 2011, Cypress filed an action against Mushel and Eurika Consultants (Eurika), an Israeli corporation on whose behalf he was alleged to have been acting. The complaint asserted causes of action for misappropriation of trade secrets and unlawful competition. Efforts to serve process on Mushel and Eurika were unsuccessful. Eventually, Cypress voluntarily dismissed the complaint against them.

### C. Complaint and Application for Temporary Restraining Order

Cypress initiated this action on June 8, 2011, by filing a complaint against Maxim and Doluca. The allegations of the complaint are discussed in part IV(B), *post*. Two days later Cypress filed an ex parte application for a temporary restraining order prohibiting Maxim and Doluca from soliciting Cypress touchscreen employees and requiring them to "immediately return all Cypress trade secret and confidential and proprietary information that became known to Defendants, including specifically any list or roster of Cypress employees working on touchscreen technology." The application was accompanied by the declaration of Rodgers as well as that of Thomas Surrette, a human resources officer at Cypress, who described the steps taken by Cypress "to protect both its technical information and employee information as confidential information." He declared that Cypress employees signed a "Patent & Confidentiality Agreement" in which they undertook not to "improperly use or disclose Cypress's proprietary information." The agreement, he asserted, "applie[d] to . . . the names, skills, and compensation of other Cypress employees." Employees also agreed to be bound by "Cypress's Code of Business Conduct and Ethics," which described "lists of customers, dealers, and employees" as proprietary and confidential information, not to be disclosed. Employees also received "training on their confidentiality obligations," including that "any data regarding Cypress's . . . lists of employees . . . , and the skills and

5

compensation of Cypress's employees and projects they are working on are proprietary and confidential and should not be published or otherwise disclosed."

Also supporting the application was the declaration of a Cypress touchscreen technologist referred to as Employee No. 294** (Employee 294XX).[5] He authenticated copies of e-mail messages he had exchanged with Zion Mushel between March 16 and March 28, 2011. These reflect that Mushel contacted him stating that he was looking for candidates for four positions involving "[t]ouch interface products." Employee 294XX replied on March 25 expressing a desire to "chat with [Mushel] about the opportunity" and stating that he was qualified for two of the four positions. Mushel inquired into his salary expectations. Employee 294XX replied that for a publicly traded company, he would "probably expect something north of $240K a year plus bonus and stock package." Mushel wrote back that the total compensation would fall in a range bracketing this figure, and advising that "[t]he positions are at Maxim [¶] Please keep it confidential." He added, "Can it be suitable to you? [¶] Can you add your experience at Cypress and your touch experience [¶] Can you recommend anyone? [¶] I appreciate your help."

In opposition to the application for a temporary restraining order, Maxim manager Bart DeCanne declared that when his business unit had job openings, his practice was to forward a job description to several outside recruiters, one of whom was Mushel. On February 9, 2011, DeCanne told five recruiters, including Mushel, that Maxim was seeking to fill a business manager position and a product definer position. Mushel inquired, "[W]hat are the best companies to hunt people for these 2 positions[?]" DeCanne sent him a list of five companies, including Cypress. In response to this

---

[5] The employee was originally named only in sealed versions of the supporting materials. However, Cypress included unredacted versions of these materials in its appendix on appeal. We will nonetheless refrain from naming this employee to maintain consistency with our treatment of Employee 60XX.

assignment, Mushel eventually provided Maxim with a number of candidates "from companies on the list other than Cypress, as well as from companies not on the list." One of the candidates presented was Employee 294XX, but DeCanne told Mushel that Maxim did not have a suitable opening for him.

Maxim also filed a declaration by one of its attorneys, Lael Andara, who described how he had identified a number of Cypress touchscreen specialists by using only publicly available sources. His efforts were concentrated on LinkedIn.com (LinkedIn), a professional networking website. He examined Cypress's own page on LinkedIn, which included a section referring to the change of one employee's position from "Touchscreen Marketing Director" to "Senior Member of Technical Staff." A link to that person's own LinkedIn page revealed that it too referred to his previous "Touchscreen" position. That page referred to other Cypress employees including one identified as a "System Engineering Director." By these and other searches on LinkedIn he was able to identify some 20 Cypress employees having touchscreen or seemingly related experience.

The Andara declaration was submitted both in an unexpurgated version, filed conditionally under seal, and a redacted version from which the names and other identifying information of Cypress employees had been removed. Simultaneously with its opposition to the application for a restraining order, Maxim moved to seal the unredacted version of the declaration on the ground that it contained "personal information concerning Cypress employees," which it had withheld from the public record out of consideration for "the employees' privacy rights."[6] Maxim indicated that it had "also given Plaintiff's counsel notice . . . in the event Plaintiff's counsel desires to attempt to assert additional grounds warranting the sealing of the redacted employee information."

---

[6] Maxim also described the Mushel declaration as containing redacted material, i.e., the "non-exclusive list of companies provided to Mr. Mushel." The only version of that document in the record on appeal contains no such redaction.

The application for a restraining order was set to be heard on June 17, 2011. On that day the parties stipulated to, and the court ordered, a 30-day "mutual standstill" in which neither party would solicit the other's employees. The court also issued a stipulated order to seal the standstill order, but declared the sealing effective only for "30 days subject to a motion pursuant to Cal. Rules of Court and CCP." It does not appear that such a motion was ever made.

### D. *Demand for Identification of Trade Secrets; Demurrer; Proceedings to Seal*

On June 29, 2011, Maxim demanded in writing that Cypress, pursuant to Code of Civil Procedure section 2019.210, "identify the trade secrets that are the subject of [its] claim for misappropriation of trade secrets."[7] Cypress did not respond until October 31, 2011, when it issued a confidential response identifying two supposed trade secrets: "1. A compilation or list of Cypress employees who worked with Cypress's touchscreen technology and products area and their employee information, including contact information," and "2. Cypress's substantive confidential information regarding its proprietary touchscreen technology and high performance products."

Meanwhile, on July 11, 2011, Maxim demurred generally to the complaint, asserting that (1) the identities of Cypress's touchscreen employees were not a trade secret because the information was publicly available; (2) the complaint failed to allege any conduct by either defendant constituting misappropriation; (3) no actionable conduct of any kind was attributed to defendant Doluca; and (4) the second cause of action, for unlawful business practices, was preempted by the California Uniform Trade Secret Act

---

[7] The cited statute provides, "In any action alleging the misappropriation of a trade secret under the Uniform Trade Secrets Act . . . , before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity . . . ." (Code Civ. Proc., § 2019.210.)

8

(Civ. Code, §§ 3426-3426.11). The demurrer was scheduled to be heard almost four months later—on November 1, 2011—apparently due to calendar congestion.

At some point Maxim informed Cypress that it was withdrawing its motion to seal the Andara declaration. Cypress then filed its own motion to seal, to be heard on November 1. In addition to seeking to seal the Andara declaration and its exhibits the motion sought to seal the declaration of Employee 294XX. In support of the motion, counsel for Cypress declared that the redacted material identified "Cypress touchscreen employees," which was "one of the trade secrets alleged in Cypress's complaint." Maxim filed opposition, contending in essence that the identities of these employees, and their possession of touchscreen experience, could not possibly be protectable trade secrets—or subject to sealing as such—since that information was available from, and indeed had been taken from, publicly available sources. Cypress filed a reply in which it disputed these premises, but also argued that whether or not the information was even colorably a trade secret, it was required to be sealed under Civil Code section 3426.5, which declares that "a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include . . . sealing the records of the action." Emphasizing the term "alleged," Cypress argued in effect that the court could not look behind the complaint's characterization of the information as a trade secret, but must instead prevent any disclosure of that information unless and until it had been adjudicated, by trial or summary judgment, not to be a trade secret.

Cypress's motion to seal was heard on November 15, 2011. At the outset of the hearing, the court asked counsel for Cypress to confirm that the gist of his argument was that "even though information may be accessible to the general public, the fact that it's being claimed as a trade secret, until that issue is litigated or adjudicated, you're entitled to protection." Counsel replied, "That's correct." After taking the matter under submission, the court denied the motion.

9

### E.  Second Demurrer; Dismissal; Fee Award

Maxim's demurrer to the original complaint was never heard because, on October 19, 2011—the last day to file opposition to the demurrer (see Code Civ. Proc., § 1005, subd. (b))—Cypress filed an amended complaint.  It differed little from its predecessor.  (See fn. 12, *post*.)  On November 23, 2011, Maxim demurred generally to the amended complaint.  In support of the demurrer, Attorney Andara filed an updated declaration listing 93 Cypress employees with apparent touchscreen experience whom he had identified from Web sites and patent office records.

On December 1, Cypress filed a request to dismiss the complaint in its entirety without prejudice.  On February 2, 2012, Maxim filed a cost bill claiming $1,049.95.  One week later, Maxim filed a motion for attorney fees under section 3426.4 based upon Cypress's "bad faith filing and maintenance of the above-referenced action."  After proceedings described more fully below, the trial court granted the motion.  On June 1, 2012, the court entered judgment for Maxim in the amount of $180,817.50 plus costs.  Eleven days later, Cypress filed this appeal.

## DISCUSSION

### I.  Issues and Standard of Review

Section 3426.4 provides that "[i]f a claim of misappropriation is made in bad faith . . . the court may award reasonable attorney's fees and costs to the prevailing party."  Application of this provision naturally raises three questions:  Is the defendant the prevailing party?  Was the claim made in bad faith?   And what is a reasonable fee?  Cypress challenges the award here on both of the first two points, denying that defendants were the prevailing parties, and contending that the court erred in finding the claim to have been made in bad faith.  Insofar as the trial court's action depends on findings of fact, we will accord them the usual appellate deference.  Insofar as the judgment depends on questions of law—such as the definition of "prevailing party"—we

10

will not defer to the trial court's ruling, but will address the question independently. And insofar as the ruling depends on questions as to which the trial court was vested with discretion, we will disturb its action only insofar as we are able to conclude that its discretion was abused.

## II. *Prevailing Party*

The trial court expressly ruled that Maxim was the prevailing party for purposes of section 3426.4. Cypress attacks this ruling on two grounds: that the trial court applied an incorrect standard, and that under a correct standard, "there was no prevailing party." We reject both contentions.

Cypress's first argument is predicated on the trial court's comments concerning its finding of prevailing party status. The order granting the fee motion states in part, "The court finds defendants are the prevailing party. (Cf. Code Civ. Proc., § 1032, subd. (a)(4)—prevailing party includes a defendant in whose favor a dismissal is entered.)" Cypress reads this to mean that the court treated the cited statute as providing "the governing definition of 'prevailing party.' " From this Cypress infers a supposition by the trial court " 'that a litigant who prevails under the cost statute is necessarily the prevailing party for purposes of attorney fees' "—a premise which, Cypress notes, has been rejected under a different fee statute. (Quoting *Heather Farms Homeowners Assn. v. Robinson* (1994) 21 Cal.App.4th 1568, 1572 (*Heather Farms*).)

This interpretation of the order fails for several reasons, the least of which is that it ignores the court's use of "cf." to introduce the statutory citation. "The signal 'cf.' (Latin: *confer*, meaning 'compare with') is used to introduce a decision [here, a statute] that is sufficiently analogous to lend support to the proposition, as where a cited case applies a similar statute." (Cal. Style Manual (4th ed. 2000), § 1.4, p. 10; see The Bluebook: A Uniform System of Citation (16 ed. 1996) § 1.2, p. 23 ["Cited authority *supports a proposition different from the main proposition but sufficiently analogous to*

11

*lend support*.  Literally, . . .'compare.' "].)  Nothing in the record suggests that the court felt its ruling was *compelled* by the cited statute.  Instead the court expressly cited that statute as *analogous support* for its conclusion.

Cypress contends that the court should have applied the rule in *Heather Farms*, *supra*, 21 Cal.App.4th at page 1574, under which the governing question is whether the party seeking fees "prevailed on a practical level."  We find it far from self-evident that section 3426.4 should be given exactly the same scope as the statute at issue in that case, or the statutes applied in the cases cited by that court.  All of those cases were implicitly concerned with the risk that a mechanical definition of "prevailing party" would produce arbitrary or inequitable results in circumstances where the party seeking fees had achieved only a superficial or illusory success.  That risk will rarely if ever arise under under section 3426.4, which authorizes an award only upon a finding that the action was pursued *in bad faith*.  A statute predicating an entitlement to fees solely or predominantly on status as the prevailing party will inevitably raise the question of why a party achieving only an arguable or equivocal victory should be permitted to recoup fees from an opponent.  The analogous question here is why a party who has made a trade secret claim in bad faith should be permitted to inflict the costs of defense on his or her opponent.  Given the manifest legislative intention to avoid such impositions, the statute would seem to warrant a liberal construction of "prevailing party," trusting in the "bad faith" requirement to filter out doubtful cases.

We need not finally decide the question, however, for we are satisfied that any reasonable finder of fact would be likely to find that Maxim was the prevailing party "on a practical level."  (*Heather Farms*, *supra*, 21 Cal.App.4th at p. 1574.)  Cypress filed a complaint that was, as we discuss below, meritless on its face, based upon theories of liability that were not merely specious, but nonsensical.  The apparent purpose of the lawsuit was to cow Maxim, and perhaps other competitors, into refraining from conduct

12

in which—as we discuss below—they had every right to engage. Cypress proceeded to lose at every subsidiary stage, as well it should have. It ultimately abandoned the action rather than face a determination on the merits that would certainly have been adverse. Contrary to its arguments, it gained no legitimate benefit from the action, practical or otherwise. At most it succeeded in notifying the labor marketplace that it would resort to spurious litigation to prevent "poaching" of its employees. Since this objective is contrary to California law and policy, its achievement cannot be considered the kind of success that will sustain prevailing party status, or prevent an opponent from acquiring that status, under section 3426.4.

In contending otherwise, Cypress constructs a kind of carnival fun house in which the facts of the case are distorted into grotesque and nearly unrecognizable shapes. First it asserts that it only dismissed the action because, "after the trial court erroneously denied its motion to seal," it "would have had to place its trade secrets in the public record" in order to continue litigating the matter. No part of this depiction survives scrutiny. First, we perceive no error in the trial court's denial of the motion to seal. That motion rested on the premise that merely by filing a pleading characterizing certain information as a trade secret, a party can compel the courts to withhold that information from the public record until such time as it finally adjudged *not* to be a trade secret. This premise would have considerable color where the information is at least arguably *secret*. Here there was no arguably secret information before the court. Nearly all of the information Cypress sought to place under seal had been compiled *by its opponent* from *public sources* where—so far as this record shows—it has remained available to this day for anyone with the appropriate subscription to find and peruse. This was not a colorable trade secret, and Cypress's calling it so did not obligate the court to place it under seal or take any other action to prevent its further disclosure. The statute on which Cypress's contrary argument rested obligates the court to employ "reasonable means" to "*preserve*

13

*the secrecy*" of an "alleged trade secret." (Civ. Code, § 3426.5, italics added.) Here there were no means, reasonable or otherwise, by which the trial court could comply with this mandate, because there was no secrecy to preserve.

Other circumstances make it highly implausible that Cypress's dismissal of the action was motivated by a desire to prevent the disclosure of information. First, there was no reason to assume or expect that the dismissal would have that effect. Had the information at issue in Cypress's motion to seal been filed by Cypress, it would have been returned to Cypress when the motion to seal was denied. (See Cal. Rules of Court, rule 2.551(b)(6).) But the vast bulk of the information at issue had been filed by Maxim. Once the motion to seal was denied, there was no legal basis for the materials in question to remain under seal. Cypress might have been entitled to a temporary continuation of their sealed status while it sought appellate relief from that order, but it sought no such relief.[8] In the absence of such a proceeding there was no basis for Cypress to assume that the materials would remain sealed. Certainly the mere dismissal of the action could not be expected to accomplish that result.

The one exception to the foregoing observations is the one item *filed by Cypress* that it sought to keep under seal: the unredacted declaration of Employee 294XX. That document presumably was—certainly it should have been—returned to Cypress upon denial of its motion to seal. (See Cal. Rules of Court, rule 2.551(b)(6).) Whether it was or not, Cypress proceeded to include the unredacted document in its appendix on appeal, making no effort to keep it or anything else out of the publicly accessible appellate

---

[8] An order sealing or refusing to seal documents is appealable as an order on a collateral matter. (*Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 77.) Had Cypress been prepared to demonstrate the inadequacy of appeal as a remedy, it could have sought an extraordinary writ. (See, e.g., *Copley Press, Inc. v. Superior Court* (1998) 63 Cal.App.4th 367; *People v. Superior Court* (2002) 104 Cal.App.4th 915; *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178.)

record.  We are thus implicitly asked to believe that an interest so overriding as to compel dismissal of a meritorious lawsuit suddenly became too insignificant to warrant a motion in this court.  We decline the request.  It is impossible to construe Cypress's dismissal of the action as an attempt to protect information from disclosure—even if information warranting such protection appeared in the record, which it does not.

Finally, we note that the motivation to which Cypress now ascribes its dismissal of the action appears never to have been mentioned in the trial court.  There Cypress claimed that it dismissed the matter "because Defendants apparently had ceased their efforts to obtain Cypress trade secrets, thus Cypress achieved its primary litigation objective."  In its opposition to the fee motion Cypress explained this supposed victory as follows:  "[A]fter Cypress filed suit, Defendants expressly agreed to not solicit Cypress employees for thirty days and thereafter voluntarily refrained from soliciting Cypress's touchscreen employees (at least as far as Cypress is aware).  This reality operated as a de facto injunction against further threats to Cypress's trade secrets.  At a practical level, Cypress was the prevailing party because it achieved the primary remedy it sought from this Court—an injunction barring any further improper solicitations by Defendants."

Unsurprisingly, the trial court was unpersuaded by this interpretation of events; nor does Cypress press this perspective on appeal, contending instead that "there was no prevailing party" because Maxim failed to achieve *its* litigation objective.  But Maxim's litigation objective, like that of every defendant, was to avoid the imposition of liability. The only sense in which it fell short of that objective is that Cypress, as it notes, "retain[ed] its right to refile this action . . . ."  But the right to file an action was hardly at the core of the case for either party.  At the core of the case was Maxim's right to solicit Cypress employees.  We find a remarkable asymmetry in Cypress's treatment of these points.  It contends on the one hand that it did not lose the case, even though it dismissed its action, because it remains free to file another suit on the same grounds.  On the other

15

hand, it contends that Maxim *did* lose the case because it agreed temporarily to desist from contacting Cypress employees—even though it only bound itself to that undertaking for a month and has long since been as free to contact Cypress employees as it was before the suit. Maxim's voluntary acquiescence in a brief restraint on its conduct was nothing like Cypress's complete abandonment of its lawsuit, and certainly was not the "injunction" Cypress prayed for, which would have barred Maxim—pendente lite and permanently—"from soliciting Cypress's touchscreen employees." In contrast, Cypress's dismissal of an objectively specious suit was an abandonment of the vociferous demands communicated at great length in pre-suit correspondence, notwithstanding that the abandonment would not technically preclude a later suit. We have no doubt that it was sufficient victory for its adversary to support an award of fees under section 3426.4.

Seeking to establish that the dismissal was the result of circumstances beyond its control, Cypress suggested below that the action was dismissed because it was unable to obtain discovery from Mushel. This appears to be its chief explanation for the dismissal in this court, where it successfully sought judicial notice of filings in its action against Mushel reflecting unsuccessful attempts to serve him with process. But the asserted inability to serve Mushel hardly barred Cypress from pursuing other, seemingly more promising avenues of discovery much closer to home. Most obviously, the premise that Maxim was deliberately "targeting" Cypress touchscreen employees would seem more readily explored by examining Maxim's own employees and internal correspondence than by deposing Mushel, who declared—and presented e-mail messages tending to show—that he had *not* been told to focus on Cypress employees, but had been given the names of five companies most likely to employ suitable candidates, and had extended his search beyond those five companies.

Indeed, the notion that Mushel's unavailability wholly thwarted Cypress's prosecution of this action verges on fanciful. Supposing Maxim had given Mushel a

16

purloined list of Cypress touchscreen employees—contrary to all indications—it had no apparent reason to tell him where the list came from or why he was asked to use it. There would have been even less reason to apprise him of a scheme by Maxim to misappropriate Cypress's touchscreen technology by hiring its specialists. There is simply no reason to believe that Mushel would know anything about any supposed plan to "raid" Cypress or to extract trade secrets from its employees.[9] The logical place to pursue these lines of investigation was right here at home, with Maxim.

The only plausible explanation for Cypress's dismissal of the action is that it feared a determination on the merits. Had Maxim's demurrer been heard, it would almost certainly have been sustained and there is no reason to believe Cypress was in any position to amend its way past the pleading stage. As will be discussed more thoroughly below, Cypress appeared to possess no facts suggesting that Maxim had done anything unlawful, or was threatening to do so. The trial court could quite properly infer that the suit was dismissed to avoid what was bound to be an adverse adjudication on the merits. The lawsuit thus achieved no legitimate objective. Maxim, in contrast, walked away with all of the rights it had when it was served with the complaint—and all the money, save the attorney fees Cypress had forced it to expend. The trial court did not err in concluding that Maxim was the prevailing party.

### III. Burden of Persuasion as to Bad Faith

We turn to the question whether the trial properly found that Cypress made its claim of trade secret misappropriation in bad faith. At the threshold Cypress contends

---

[9] Nor does an inference adverse to Maxim arise from Mushel's supposed evasion of service. Rodgers himself provided ample motive for that conduct by demanding, in pre-suit correspondence, that Mushel identify all Cypress employees he had contacted. Mushel later explained in a declaration that his business depended on being able to contact potential candidates in confidence, and a breach of that confidence—as demanded by Rodgers—would impair his ability to earn his livelihood.

17

that the finding was marred by procedural error in that the court erroneously placed the burden on Cypress to persuade the court that the action was *not* pursued in bad faith. This contention rests on distortions of the record. Cypress first cites the court's remark to counsel for Cypress, at the hearing on the fee motion, that "the burden is on you." But Cypress takes the remark out of context. The court had first asked counsel "where is the evidence that Maxim hired [Mushel] specifically to recruit Cypress employees?" Counsel alluded to a Mushel e-mail message that, as counsel put it, "specifically references Cypress Semiconductor employees as being appropriate."[10] He asserted that this was enough "for purposes of filing the lawsuit, to . . . get to the point where we can actually get discovery and ask him [i.e., Mushel], what were you doing? What information were you using? Where did you get the information?" Counsel remarked that if Mushel had testified that he identified Cypress employers by searching the internet, "that would have been important information for Cypress to know to determine the strength of the case in whether to proceed."

It was here that the court made the comment now cited by Cypress as proof that the court misallocated the burden of persuasion: "Here is the problem I have with your logic. I understand what you're saying. But you're the plaintiff in the case. And you're

---

[10] This was an apparent reference to Mushel's statement in an e-mail to Employee 60XX, that "[p]eople from Cypress are very suitable." The fact that Cypress touchscreen specialists would be "very suitable" for some jobs at Maxim seems self-evident; at any rate it hardly indicates that Mushel (or Maxim) was singling out Cypress workers. Indeed, the contrary is immediately apparent from a second message to Employee 60XX in which Mushel asked, "Can you recommend anyone from Cypress *or others*?" (Italics added.) Similarly, in his boilerplate solicitations to other Cypress employees, including Employee 294XX, Mushel wrote, "People from *Cypress etc* are very suitable." (Italics added.) Thus even without the uncontradicted evidence later presented by Maxim showing that Cypress employees were not singled out for recruitment, it was obvious from the very e-mails cited by Rodgers that Mushel was seeking potential candidates wherever they might be found.

asking the defendant to disprove a—the burden really isn't on them. The burden is on you to show that they weren't doing it. [Presumably meaning, "weren't obtaining names by lawful means."] And so the fact that the defendant didn't come back and present all this evidence, and we may ultimately not know, doesn't meet *your burden as a plaintiff* in terms of having facts or evidence upon which to rely." (Italics added.)

These comments concern Cypress's burden of proof *as plaintiff in the action*, not the burden of persuasion on the fee motion. Any doubt on that score is dispelled by the next paragraph in the transcript, which Cypress neglects to mention: "[I]t kind of dovetails your argument in your papers that you were the prevailing party. I mean with all due respect, I don't think you were. I think the case was dismissed without prejudice. *I don't think there was any evidence in the case.* . . . And I didn't take this lightly. I looked long and hard at this. There is a lot of money at issue. And it's a fairly strict standard that *they have to prove*, okay? And that's why I wanted to entertain oral argument this morning." (Italics added.) The "they" who had to meet a "fairly strict standard" could only be the defendants, whose burden it was on the motion for fees to persuade the court that the action had been maintained in bad faith. Nothing in the transcript suggests that the court misunderstood this basic point.

Cypress also cites this sentence in the court's order granting the fee motion: "Plaintiff relies exclusively on allegations from its first amended complaint to establish merit, but plaintiff fails to present any evidence to support its claim for misappropriation." Again the statement is quoted out of context. What the court wrote is, " '*Objective speciousness* exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim.' [Citation.] Plaintiff relies exclusively on allegations from its first amended complaint to establish merit, but plaintiff fails to present any evidence to support its claim for misappropriation." (Italics added.) In other words, the case satisfied the quoted test for objective speciousness in

19

that there was "a complete lack of evidence to support the claim." The allusion to Cypress as the logical party to produce such evidence is hardly enough to impeach the judgment.

## IV. *Finding of Bad Faith*

### A. *Introduction*

We turn to the question whether the record sustains the trial court's finding that Cypress maintained the action in bad faith. "Although the Legislature has not defined 'bad faith' " for purposes of section 3426.4, "our courts have developed a two-prong standard: (1) objective speciousness of the claim, and (2) subjective bad faith in bringing or maintaining the action, i.e., for an improper purpose." (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1275 (*FLIR Systems*).)

Cypress acknowledges that the trial court's finding of bad faith must be upheld if it is supported by substantial evidence, but it frames the question as whether "Maxim's evidence . . . prove[d] objective speciousness." That is not the test. A defendant moving for attorney fees under section 3426.4 is "not required to conclusively prove a negative (i.e., that they did not steal [the plaintiff's] trade secrets). Instead, under the 'objectively specious' standard, it [i]s enough for defendants to point to the absence of evidence of misappropriation in the record." (*SASCO v. Rosendin Elec., Inc.* (2012) 207 Cal.App.4th 837, 848.) Further, the sufficiency of the evidence to support a given finding is not tested solely by examining evidence presented by one party, but raises the question whether "*on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . . [W]hen two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

Any question of a plaintiff's good faith must take into account, and will typically begin, with an examination of the plaintiff's own pleadings and such proofs as he or she

20

may have introduced into the record.  In this case, as we shall see, the finding of bad faith is supported by a facial examination of Cypress's own complaint as well as the materials it offered in support of its applications for a restraining order and to seal portions of the record.

### B. *Sufficiency of Evidence of Objective Speciousness*

Objective speciousness is said to be present "where the action superficially appears to have merit but there is a complete lack of evidence to support the claim." (*FLIR Systems*, *supra*, 174 Cal.App.4th at p. 1276.)  The first clause, of course, is superfluous; there is no logical reason to require that the action "superficially appear[] to have merit."  Here it is doubtful that this is the case.  The original complaint, which was amended only inconsequentially, is a model of evasive, equivocal, and circumlocutory pleading.  Much of the complaint consists of wholly extraneous matter.  Many paragraphs read like a press release promoting Cypress's touchscreen technology.  Others violate rules of pleading as old as the Field Codes.  Thus the complaint sets out, in tabular form, a series of factual assertions made by Doluca in correspondence with Rodgers, juxtaposed with "facts" supposedly demonstrating their falsity.  This is a pure example of pleading " 'the defendant's pretenses,' " which are no part of a proper complaint. (4 Witkin, Cal. Procedure (5th ed. 2008) Pleadings, § 378, p. 513, quoting *Green v. Palmer* (1860) 15 Cal. 411, 414.)

Amidst such dross the only colorably actionable conduct attributed to Maxim is its attempt, through Mushel, to recruit Cypress employees.  In the absence of additional, liability-producing circumstances, that conduct was entirely lawful.  "[N]o actionable wrong is committed by a competitor who solicits his competitor's employees or who hires away one or more of his competitor's employees who are not under contract, so long as the inducement to leave is not accompanied by unlawful action.  [Citations.]" (*Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 255; *VL Systems, Inc. v. Unisen,*

21

*Inc.* (2007) 152 Cal.App.4th 708, 713.) More specifically, " '[m]ere solicitation of an employee, under no contract of employment, to leave and associate with a competing firm is not illegal. [Citation.] "However, if either the defecting employee or the competitor . . . is guilty of some concomitant, unconscionable conduct, the injured former employer has a cause of action to recover for the detriment he has thereby suffered." [Citation.] Thus, if there is a "misappropriation of trade secrets as a concomitant of the solicitation," [citation], relief would be granted.' " (*ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1019 (*ReadyLink*), quoting *Hollingsworth Solderless Terminal Co. v. Turley* (9th Cir. 1980) 622 F.2d 1324, 1337-1338.)

Cypress failed to competently allege that there had been any misappropriation of trade secrets, whether "as a concomitant of [Maxim's] solicitation" of Cypress employees or otherwise. (*ReadyLink, supra,* 126 Cal.App.4th at p. 1019.) The complaint hints at two distinct theories on this point: first, that Maxim was using trade secrets to *identify* Cypress's "touchscreen employees"; and second, that Maxim was attempting to hire these employees for the purpose of gaining access to trade secrets they had learned in their work for Cypress. Neither of these theories appears colorable, and the manner in which they were pleaded strongly suggests that Cypress never had any evidence to support either of them.

The first theory makes its initial appearance as an allegation that "Maxim has used a headhunter to repeatedly target Cypress's touchscreen employees, *apparently* using improperly obtained confidential information regarding Cypress touchscreen employees to do so." (Italics added.) Of course, an allegation that something "apparently" happened is speculative on its face. It has no place in a pleading, as it is pregnant with the admission that it may not have happened at all. (See *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1024 [in passing on sufficiency of complaint, court disregards "speculation"].) A finding that such a statement is true will

22

not sustain a judgment in the plaintiff's favor; it is therefore not an "ultimate fact." It may be entirely true that a magician "apparently" sawed a lady in half, but proof of that fact will not sustain a claim for battery. A pleader's unwillingness to commit to an unequivocal assertion of the facts necessary to sustain a judgment is strong evidence that he or she doubts the existence of a cause of action.

Elsewhere in the complaint we find an allegation that "[b]y improperly soliciting and targeting Cypress's employees, Maxim has improperly obtained a list or roster of Cypress employees working on touchscreen technology and has improperly used that information to try to poach Cypress employees who have knowledge regarding Cypress's advanced technological achievements in this area." This allegation seems less equivocal than the previous one, but suffers from two major deficiencies. First, an allegation that someone achieved a stated result "improperly" is no substitute for allegations of specific circumstances establishing a breach of duty or otherwise subjecting the actor to liability. Second, the sentence is rendered ambiguous by the introductory phrase, which appears to describe, if rather incoherently, the process by which Maxim secured the "list or roster," opening the possibility that *Maxim compiled the list itself* by gathering increments of relevant data from Cypress employees or other sources. In fact of course this is precisely what Mushel appears to have done. As reflected in the e-mails presented by Cypress itself, his messages to prospective candidates often included requests that for referrals to any other suitable candidates they might know. Nothing in this record suggests a basis for Cypress to believe, let alone for a court to find, such requests wrongful in themselves. A "list" compiled by Mushel or Maxim by such methods would also be a perfectly legitimate basis for them to search for Cypress employees—and employees of other companies—who might find a place at Maxim.

Nor does anything outside the pleadings suggest any basis for a belief, or even a reasonable suspicion, that Maxim or Mushel had come into possession of some sort of

23

secret in-house list of Cypress's touchscreen employees. Cypress never even directly asserted the existence of such a list, let alone the circumstances making it a trade secret. At most it implied that there was an "employee roster" which Cypress viewed as "proprietary" and did not "publish or share." This roster was never tied, by allegation or otherwise, to any conduct by Maxim or Mushel. Nor did Cypress coherently allege, or attempt to show, that the disclosure of a coworker's identity by a Cypress employee would constitute the divulging of legally protected information. The complaint referred at great length but with equally great ambiguity to Cypress's efforts to prevent the disclosure of confidential information, including unspecified information concerning its employees. It nowhere stated facts sufficient to establish than an employee would violate any duty by, for example, telling a headhunter the mere identity of a coworker or the kind of work the latter performed.[11]

---

[11] Apart from a reference to "lists of . . . employees," the complaint's most specific description of supposedly confidential employee information is a reference to "the names, skills, *and compensation* of other Cypress employees." (Italics added.) But the extent to which this information was actually deemed confidential is not disclosed; the complaint states only that these matters were among the things to which a confidentiality agreement "applie[d]." How it applied, or what exactly it said about them, was never disclosed. Further, the combination of "names" with "compensation" invites suspicion, since the conjoining of pertinent but untrue allegations with true but irrelevant ones is a time-honored device of the equivocal pleader. Salary information, unlike the mere names of employees, has long been recognized as potentially sensitive in a competitive labor market. (See *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 350-351 [corporate officer breached fiduciary duty by supplying competitor with salary and other information concerning employees considered most desirable for hiring by new enterprise]; *id.* at p. 351 [unpublished "list of salaries" constitutes "confidential information," such that "an officer of a corporation violates his trust if he reveals it to a competitor for the purpose of enabling the solicitation of the corporation's employees by the competitor"].) But there is no indication that Maxim had any inside information about either the names or salaries of Cypress employees. The only evidence bearing on that subject is Mushel's *asking* a Cypress employee about *his own* "salary expectations" with reference to an opening at Maxim. "It requires little talent to distinguish between a situation in which an individual voluntarily discloses his own salary to another and one in which the unpublished salary list of a group of prospective employees is revealed to a

As Maxim vividly demonstrated, it was not at all difficult to identify dozens of Cypress touchscreen specialists without relying on any internal Cypress information. Maxim's attorneys eventually found nearly 100 such names by searching a single website and patent records. Cypress never pointed to anything creating even the appearance that Mushel was using protected Cypress information. In other words, even the "apparently" quoted above was never substantiated.

The second theory on which Cypress sought to claim misappropriation of a trade secret is that Maxim was seeking to hire Cypress employees "in order to acquire and use Cypress's confidential information in an effort to catch up . . . in the development of touchscreen products." This allegation is repeated several times in slightly variant forms, i.e., that "Maxim . . . has been using a headhunter to raid Cypress's touchscreen employees to obtain Cypress's touchscreen technology for Maxim"; that "[u]pon information and belief, Maxim is trying to raid Cypress's touchscreen employees in order to acquire Cypress's confidential information"; and that "in targeting the specific employees with knowledge of Cypress's touchscreen technology, Maxim is improperly attempting to acquire, use or disclose Cypress's substantive confidential information regarding its touchscreen technology. This is threatened misappropriation . . . ."

In other words, according to this theory Maxim was seeking to hire Cypress employees so that it could appropriate whatever trade secrets they might know. We may assume that at least some aspects of "Cypress's touchscreen technology" were genuine trade secrets. It is absolutely clear, however, that no such misappropriation had occurred when the complaint was filed. Maxim had extended an offer to one Cypress employee, who initially accepted but was ultimately prevailed upon to remain with Cypress. So far as anything in the record suggests, Maxim never extended an offer to any other

competitor for the purpose of facilitating the recruitment of the corporation's personnel." (*Id.*, at p. 352.)

25

"touchscreen employee." Therefore it never had the occasion or opportunity to engage in the posited brain-picking. As reflected in the last sentence quoted above, the claim was purely one of *threatened* misappropriation.

Nothing in the complaint, and nothing submitted by Cypress since filing the complaint, lends any color to the naked assertion that Maxim was pursuing Cypress employees with the object of extracting trade secrets from them. In the trial court Maxim suggested that Cypress's claims in this regard implicitly rested on the doctrine of inevitable disclosure, under which some jurisdictions will permit a plaintiff to substantiate a trade secret claim against a departing employee " 'by demonstrating that [the] defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.' " (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1458 (*Whyte*), quoting *PepsiCo, Inc. v. Redmond* (7th Cir.1995) 54 F.3d 1262, 1269.) This doctrine, as Maxim pointed out, has been flatly rejected in this state as incompatible with the strong public policy in favor of employee mobility. (*Whyte*, *supra*, at p. 1462, citing Bus. & Prof. Code, § 16600, and cases applying it.) The inevitable disclosure doctrine would contravene this policy by "permit[ting] an employer to enjoin the former employee without proof of the employee's actual or threatened use of trade secrets based upon an inference (based in turn upon circumstantial evidence) that the employee inevitably will use his or her knowledge of those trade secrets in the new employment. The result is not merely an injunction against the use of trade secrets, but an injunction restricting employment." (*Whyte*, *supra*, at pp. 1461-1462.)

Cypress expressly disclaimed any reliance on the doctrine of inevitable disclosure, but in the absence of that doctrine we can detect no basis for its allegation of threatened misappropriation. Indeed, the result condemned in *Whyte*, *supra*, 101 Cal.App.4th at page 1461—"to enjoin [hiring of] [its] . . . employee[s] without proof of [any] . . . actual or threatened use of trade secrets"—is precisely what Cypress prayed for here: "a

26

preliminary and permanent injunction against Defendants . . . enjoining/restraining them from soliciting Cypress's touchscreen employees." Given the complete absence of any coherent factual allegations suggesting a threatened misappropriation, Cypress's second theory of relief was an inevitable disclosure claim, or it was no claim at all—and in either case, it did not state grounds for relief under California law.

We have generally directed our comments to Cypress's original complaint because that pleading reflects the state of Cypress's knowledge and understanding when it initiated the suit. These comments apply just as well, however, to the amended complaint, which did nothing to supply the missing factual allegations.[12] Nor did any of the materials filed in support of Cypress's position on subsequent motions add any flesh to the evasive and conclusory assertions of liability in its pleadings. We therefore cannot say that the trial court's finding of objective speciousness lacked substantial evidentiary support.

## C. *Lack of Express Finding on Subjective Element*

This brings us to the question whether the trial court properly found that the "subjective" element of bad faith was present. (See *FLIR Systems*, *supra*, 174

---

[12] As far as we can tell, the amended complaint differed in the following respects: (1) Maxim was alleged to have solicited 10, rather than nine, Cypress employees; (2) a new paragraph alleged that Maxim had admitted engaging Mushel "to solicit touchscreen employees on behalf of Maxim"; (3) another new paragraph alleged that after learning its employees had been identified on social Web sites, Cypress "clarif[ied] its written policy regarding such publications," and Rodgers wrote to the identified employees warning them against "disclos[ing] confidential information on social websites"; (4) the phrase "at least" was inserted into several paragraphs stating how many confidential memoranda some of the solicited employees had written; (5) a new paragraph stated that the tenth solicited employee had "also written confidential memoranda during his tenure at Cypress"; (6) a paragraph alleging that Maxim committed acts of unlawful competition was modified to state that "[d]efendants" committed such acts; and (7) an enumeration of these acts was expanded to include "Mr. Doluca's repeated denials and misrepresentations . . . as alleged above," referring to his supposedly false statements in correspondence with Rodgers.

27

Cal.App.4th at p. 1275.) Cypress again opens its treatment of the question with a procedural objection, i.e., that the court "made no finding at all about Cypress's subjective belief in the merits of its case against Maxim." This contention fails on three distinct grounds.

First, it is simply not true that the court "made no finding at all" on the subjective element of bad faith. The court made no *express* finding on that issue, but we have previously rejected the proposition that a court awarding fees under section 3426.4 must "stat[e] the basis for its decision." (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 578 (*Yield Dynamics*).) Even if the rule were otherwise, Cypress would have waived the requirement by failing to seasonably request such a statement. (See *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 269 (*Shaw*).) In either event, where no express finding is required a reviewing court must "presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record." (*Id.* at p. 267; see *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140, quoting *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" ' "All intendments and presumptions are indulged to support [the order] on matters as to which the record is silent, and error must be affirmatively shown." ' "].) "In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence." (*Shaw*, *supra*, 170 Cal.App.4th at p. 269; see *Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 192 [sustaining "implicit finding" of factual basis for fee award].)

Second, Cypress's claim of procedural error depends on yet another unnatural construction of the record. In its order granting the fee motion, the court acknowledged that an award of fees required both objective speciousness and "subjective bad faith in bringing or maintaining the action, i.e., for an improper purpose." The court then explained, in two sentences, its finding of objective speciousness. Cypress's entire claim

28

of error rests on the court's failure to similarly explain its finding of subjective bad faith. The mere lack of parallel structure in the trial court's order hardly supports a belief that the court overlooked or ignored the requirement it had just explicitly acknowledged. A far more plausible explanation, given this record, is that the case was so redolent of improper purpose that the court deemed it both unnecessary and unduly burdensome to recite all the evidence supporting such a finding.

Finally, Cypress's references here and elsewhere to its "subjective belief in the merits of its case" are apparently intended to convey the impression that the absence of such a belief is essential to a fee award under section 3426.4. The circumstances discussed above and below provided ample basis to find that Cypress lacked a subjective belief in the merits of its claims. But such a finding was not necessary, because the test is not what the plaintiff believed about its objectively specious claim, but for what *purpose* it pursued such a claim. (See *FLIR Systems*, *supra*, 174 Cal.App.4th at p. 1275; see *SASCO v. Rosendin Elec., Inc.*, *supra*, 207 Cal.App.4th at p. 847 ["Subjective bad faith under section 3426.4 means the action was commenced or continued for an improper purpose, such as harassment, delay, or to thwart competition."].) If the court finds that a claim is objectively specious, and that the plaintiff made it for an improper purpose, there is no further requirement that the court also find a lack of "subjective belief in the merits of its case."

Cypress's suggestions to the contrary appear to rest on a passage in *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1263, where the court quoted *Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 932 (disapproved on another point in Reid v. Google (2010) 50 Cal.4th 512, 532, fn. 7), as follows: " '*Good faith*, or its absence, involves a factual inquiry into the plaintiff's subjective state of mind [citations]: Did he or she believe the action was valid? What was his or her intent or purpose in pursuing it? A subjective state of mind will rarely be

29

susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence.' " Both cases predated the above-cited decisions expressing the subjective element in terms of improper purpose, and the case in which the quoted language originated was not decided under section 3426.4, but under a statute authorizing a fee award on a finding that an action against a public entity was "brought . . . 'without reasonable cause' or without 'good faith belief that there was justifiable controversy under the facts and law which warranted the filing of the complaint.'." (*Knight*, *supra*, at p. 931, quoting Code Civ. Proc., § 1038, subd. (a); italics added.) Neither case holds that a subjective belief in the merits of a claim will bar a fee award under section 3426.4 if the claim was maintained for an improper purpose.

To be sure, a genuine belief that one's claim has merit tends to show that it is being pursued for the proper purpose of vindicating a legal right honestly believed to have been infringed. (See *Yield Dynamics*, *supra*, 154 Cal.App.4th at p. 579, italics added [error to exclude evidence tending to support inference that plaintiff's principals "subjectively believed the trade secret claim had merit, *and were pursuing it for that reason*"].) Similarly, a lack of belief in the merits of one's claims is strong evidence that the claims are asserted for a purpose other than the vindication of one's rights. But it does not follow, and is not the case, that a subjective belief in the merits will bar a fee award where an objectively specious claim is found on substantial evidence to have been maintained for an improper purpose.

### D. Sufficiency of Evidence of Improper Purpose

If anything, the evidence of improper purpose was stronger than the evidence of objective speciousness. First, the parties' pre-suit correspondence supports a reasonable inference that the actuating motive of Cypress's president Rodgers was to scare Maxim away from attempting to hire *any* of Cypress's touchscreen employees under *any* circumstances, lawfully or otherwise. In the letter commencing this exchange, Rodgers

30

wrote to Maxim's president Doluca, "The purpose of this letter is to inform you that Maxim is seeking to obtain Cypress's proprietary information illegally by targeting Cypress employees skilled in our touchscreen technology. If Maxim persists in these actions, Cypress will sue Maxim and enjoin it from creating or distributing any products using any touchscreen expertise obtained from Cypress through former employees." Critically, Rodgers acknowledged that " '[t]his is America;' and . . . employees can change jobs when they want." This was followed by a discourse assertedly demonstrating that "Maxim's motive—technology—is clear." After boasting of Cypress's superior expertise in touchscreen technology, Rodgers asserted that Maxim had "made a . . . critical mistake in its effort to illegally appropriate our touchscreen systems knowledge. Your company hired an Israeli headhunter to hire our engineers— specifically our touchscreen engineers—and we have it in writing."[13] (Italics added.) Of course, all Rodgers had "in writing" were the e-mails from Mushel to Cypress employees, and all those emails showed was that Mushel viewed employees with appropriate experience, from Cypress *and other companies*, to be "suitable" candidates for the positions he had been hired to fill. Rodgers also characterized Mushel as having

---

[13] Rodgers's also wrote that "all of the potential excuses about our touchscreen employees first contacting Maxim, or being hired by coincidence or by friends at Maxim are preempted." Insofar as this was meant to suggest that no Cypress employee had initiated any of the contacts in question, it is yet another instance of trying to invest evidence with a meaning contrary to its plain import. The second earliest correspondence shown by this record is an e-mail from Employee 60XX to Mushel, dated June 21, 2010, asking, "Who is the company looking? *I may have talked to them already*." The record does not disclose whether he was referring to a prior contact with Maxim, but it is clear that he had made prior contact with some potential employer. Even more tellingly, two weeks before the solicitations precipitating this lawsuit, Employee 60XX had written to a contact at Maxim—apparently a personal acquaintance—expressing interest in a position in Austin. It thus appears that Cypress's flagship example of supposedly improper solicitation involved a worker who had made at least one prior inquiry into employment at Maxim, and quite possibly two, on his own initiative. Rodgers's assertions to the contrary fly in the face of the very correspondence cited by him.

31

"first recruited a touchscreen expert in our CTO group through a general email to Cypress.com (1st email) attached—and then asked our employee to violate his Employee Agreement by giving out proprietary Cypress employee information (2nd email)." The referenced e-mails, supposedly attached to the letter, are not included with any of the five copies of this letter in Cypress's appendix, so we are left to ponder fruitlessly the characterization of one of them as "a general email to Cypress.com." The characterization of the second e-mail, however, can be evaluated on this record: Cypress never presented any concrete evidence that any Cypress employee would breach any duty to Cypress by furnishing any of the information Mushel requested.

The final two paragraphs of the letter again threatened litigation, *and resulting expense*, if Maxim did not desist from its attempts to hire Cypress employees: "You might know of me well enough to know that I do not make idle threats. Read it again: *The next time a Cypress employee working on touchscreen technology is illegally solicited or offered employment by Maxim, Cypress will sue your company*, pursuing all legal remedies available to prevent Maxim from stealing our IP through unlawful hiring. practices. [¶] . . . . *The next person you try to hire illegally from Cypress will not be cheap for your company*, as Cypress will spare no effort or legal expense to protect its people and its technology."

This letter supports an inference that the purpose of the lawsuit was to impose a financial penalty upon, and thereby deter, Maxim's attempts to hire Cypress technical employees. Indeed, it might be inferred that the purpose of the lawsuit was to inhibit not only Maxim but other competitors as well from attempting to engage in the same, entirely lawful conduct. Such an inference gains weight from a press release apparently issued by Cypress on the day it dismissed the action. In it, Cypress "announced that it ha[d] dropped its trade secret lawsuit against Maxim Integrated Products. The lawsuit charged Maxim with trying to gain access to Cypress's touchscreen intellectual property by

32

unfairly targeting key Cypress employees. Cypress dropped the lawsuit 'without prejudice,' so it can be filed again in the future if necessary. [¶] 'We are well aware that our people are our greatest asset,' said T.J. Rodgers, President and CEO of Cypress. 'We will not tolerate unfair attempts to lure our employees away in order to gain access to our trade secrets. In this case, Maxim has been unsuccessful, both in hiring our people and in making inroads in the touchscreen market, allowing us to drop the suit. However, we will file again if we perceive more unfair efforts to hire away our employees.' " (Italics added.)

It bears emphasis that despite the repeated references to "unfair"—not illegal—hiring practices, Cypress at no time pointed to *any information whatever* tending to show that Maxim was doing anything more than seek the most qualified candidates for openings in its own enterprise. It is of course true that any technicians hired from Cypress might possess trade secrets they could not lawfully share with their new employer. But as Rodgers himself wrote to Doluca, hiring such employees posed an inherent risk to Maxim as well. If Maxim succeeded in engaging Cypress employees laden with such secrets, he wrote, it would run the risk that they might "contaminate your touchscreen products with an IP liability." When he specifically linked this risk to Maxim's potential hiring of Employee 60XX, Doluca acknowledged the risk but deemed it manageable, writing that Employee 60XX would "not be working on touch technology at all," and adding, "I will make sure he does not contaminate our touch technology." In continuing to insist that the mere attempt to hire that employee and others warranted judicial relief, Cypress is revealed as relying entirely on the generic risk that employees knowledgeable in a given specialty may give a new employer the benefit not only of their expertise but also of trade secrets acquired in a previous employment. As previously noted, this is a de facto invocation of the " 'inevitable disclosure' " doctrine, which courts

33

in this state have rejected. (*FLIR Systems, Inc. v. Parrish*, *supra*, 174 Cal.App.4th 1270, 1277; *Whyte v. Schlage Lock Co.*, *supra*, 101 Cal.App.4th 1443, 1462.)

The trial court was also entitled to conclude that the litigation was conducted in a manner calculated to magnify Maxim's legal expenses by impeding the progress of Cypress's own lawsuit while employing tactics that were discourteous and inconsiderate at best, and vexatious and oppressive at worst. For example, Cypress waited to amend its complaint until the last day on which it could have filed opposition to the demurrer interposed by Maxim nearly four months earlier. As previously noted, the amended complaint added nothing of substance to its predecessor. Yet its filing required Maxim to demur a second time, and delayed any determination on the legal sufficiency of the pleading for another four months.

An inference of dilatory and oppressive intent is also supported by Cypress's belated and evasive response to Maxim's demand for specification of the trade secrets at issue. As counsel pointed out, Cypress was not entitled to withhold a definitive statement of the alleged trade secrets until some later time. He cited *Perlan Therapeutics, Inc. v. Superior Court* (2009) 178 Cal.App.4th 1333, 1350, where the court wrote that a party was not entitled to describe a trade secret so vaguely as to amount to an open-ended work in progress. " 'If Perlan does not know what its own trade secrets are,' " the court wrote, " 'it has no basis for suggesting defendants misappropriated them.' " The court below could quite reasonably conclude that this language aptly described Cypress's claim here.

Further similar evidence appears in Cypress's responses to discovery. On December 13, 2011, counsel for Maxim sent a "meet and confer" letter to opposing counsel protesting, among other things, an objection to an interrogatory as "vague and ambiguous" when it asked Cypress to " 'identify' what you allege in the complaint to be 'confidential' and a 'trade secret.' " In response to a interrogatory seeking the basis for

34

its asserted belief that Maxim had misappropriated or misused Cypress's touchscreen technology, Cypress had written that it was "in the process of investigating and compiling documentation regarding its allegations in its Complaint." As counsel correctly observed, this was "in effect an admission that there are no facts or documents that support the claims in the Complaint." Cypress also apparently refused to provide discovery concerning "how Cypress protects its confidential information as well as how it recruits potential employees."

Naturally these tactics necessitated considerable effort by opposing counsel, who declared in support of the fee motion that his office had prepared a motion to compel discovery when it became aware of the dismissal of the action. This occurred, counsel for Maxim declared, when he learned—along with the rest of the world—about Cypress's press release. A mere three days earlier, counsel for Cypress had written to him suggesting that they meet in about two weeks to discuss the long-brewing dispute over Cypress's failure to make discovery. Counsel for Cypress made no apparent effort to notify Maxim of the dismissal, and indeed did not send a copy of the dismissal until five days after it—and the press release—were promulgated.

Finally, the trial court was also entitled to take note of the transparent unsoundness of Cypress's generation of further litigation—and litigation expense—through its transparently unsound attempts to seal a compilation of Cypress touchscreen technicians prepared by *Maxim* (i.e., its attorneys) from *public sources*. Admittedly, Maxim itself generated some early confusion by seeking to file this information under seal. Once it abandoned that effort, however, it had to be clear to Cypress and its counsel that nothing in the record could overcome the presumption in favor of public accessibility in court proceedings.

In sum, the record amply supported the trial court's implied finding that the action was maintained for an improper purpose.

## DISPOSITION

The judgment for fees is affirmed.

_____
RUSHING, P.J.

WE CONCUR:



_____
PREMO, J.




_____
ELIA, J.




*Cypress Semiconductor Corporation v. Maxim Integrated Products, Inc., et al.*
**H038555**

37

Trial Court:                                    Santa Clara County Superior Court
                                                Superior Court No.:  1-11-CV202605


Trial Judge:                                    The Honorable Peter H. Kirwan


Attorneys for Plaintiff and Appellant          Morrison & Foerster
Cyress Semiconductor Corporation:

                                                Arturo J. Gonzalez
                                                Eric A. Tate
                                                Tritia M. Murata
                                                Miriam A. Vogel
                                                Purvi G. Patel


Attorneys for Defendants and Respondents       Ropers, Majeski, Kohn & Bentley
Maxim Integrated Products, Inc., et al.:

                                                Michael J. Ioannou
                                                Susan H. Handelman
                                                Terry Anastassiou


*Cypress Semiconductor Corporation v. Maxim Integrated Products, Inc., et al.*
**H038555**