Filed 3/10/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GLASSDOOR, INC., <br><br> Petitioner, <br><br> v. <br><br> SUPERIOR COURT OF SANTA CLARA COUNTY, <br><br> Respondent; <br><br> MACHINE ZONE, INC., <br><br> Real Party in Interest. | H042824 <br> (Santa Clara County <br> Super. Ct. No. CV282558) |

Petitioner Glassdoor, Inc. (Glassdoor), operates a Web site on which workers can post "reviews" of past and current employers. Real party in interest Machine Zone, Inc. (MZ) is a developer of software products including the online multiplayer game "Game of War: Fire Age." During the pendency of this proceeding it has rebranded itself as "MZ" and has released a product labeled RTplatform, which it describes as "a stand-alone real-time platform technology that enables the exchange of data between billions of endpoints worldwide virtually simultaneously." Prior to this rebranding, MZ brought suit against a former employee named fictitiously as John Doe. MZ contends that in violation of a nondisclosure agreement signed by all MZ employees, Doe posted a review on Glassdoor's Web site disclosing confidential information concerning the RTPlatform technology. When Glassdoor refused to identify Doe, MZ moved for an order

compelling it to do so.  The trial court granted the motion.  Glassdoor brought this petition for a writ directing the trial court to set aside its order.  We have concluded that MZ failed to make a prima facie showing that Doe's statements disclosed confidential information in violation of the nondisclosure agreement.  Accordingly, we will grant the requested relief.

## BACKGROUND

According to the complaint, Doe posted the offending review on Glassdoor's Web site on or about June 21, 2015.[1]  Entitled "A Scandal," the review commences by identifying three "Pro's" of employment at MZ:  "Free food, free massages, [and a] spacial [*sic*] office."  It then sets out four "Con's," as follows:

"1. Management spreads unreal information to both outside VC's and employees. For example:

"a) They claim that they have developed a language translator. However, their 'translator' just calls Google translation API.  They actually don't have a product translator.

"b) In July 2014, their CEO announced that they raised $250,000,000 (250 million) from JP Morgan, based on a total value 3 billion dollars.  After one year has been passed, it's not verified by any other resources.  The CEO has never mentioned it again.

---

[1]  The trial court sealed the review in its entirety.  Since any confidential information disclosed in the review has now become publicly known, we asked for supplemental briefing on the question whether the review should remain sealed.  In response, MZ conceded that the seal should be lifted.  Accordingly, we have ordered that the review and all other materials filed under seal in this matter be unsealed.  See pt. IV, *post*, concerning the overbreadth of the original sealing order.

2

"3. Terrible work-life balance, except for the platform team, which do not know what to work on. For Data Science team and Game Engineering team, people usually go home after 10:00pm and have on-call duties every month.

"4. The senior management lost directions. The company has invested heavily in the platform team (there are 70-80 engineers). However, after one year, nothing has been done by that team. The CEO said in the team meeting: I don't expect products and revenue from the platform team. I only want you can show demos. The platform is only for attracting investments from VCs." (Some punctuation regularized.)

Under the heading "Advice," the review stated, "Stop telling the investors and employees the unreal information. A company cannot survive forever by cheating!" The review went on to assert that employees were "Very Dissatisfied"; that they, or Doe, " 'Disapprove' [of] Gabriel Leydon (CEO)"; that Doe would not recommend MZ to a friend; and that MZ's business outlook was "Getting Worse."

According to MZ, it notified Glassdoor on June 22, 2015, that, in its view, the post disclosed "confidential information regarding Machine Zone's valuation and fundraising, as well as internal, confidential statements made by Machine Zone's CEO and management regarding Machine Zone's confidential and strategic business plans." MZ states that the review was removed from the Web site on June 23.

MZ filed its complaint on July 1, 2015, asserting a single cause of action against Doe for breach of contract. It alleged that Doe breached the nondisclosure agreement by "disclosing to third parties Machine Zone's confidential, non-public information." MZ did not identify the statements in the review supposedly having this effect; nor did it specify the confidential information supposedly disclosed. Instead it broadly alleged that Doe had "provided details concerning undisclosed technology Machine Zone has and is developing, the stage of development of that technology and the scope of Machine

3

Zone's investment therein." MZ further alleged that the post "quoted Machine Zone CEO Gabriel Leydon's confidential internal statements concerning that technology."

On July 2, Machine Zone promulgated a subpoena directing Glassdoor to produce a copy of Doe's review as well as information identifying its author. Glassdoor produced a copy of the review, but otherwise objected to the subpoena on the grounds, among others, that disclosure of the poster's identity would violate his "right to speak anonymously under the First Amendment," and that Machine Zone had "failed to make a prima facie showing that any statement in the review . . . is actionable."[2]

MZ filed a motion to compel. It challenged Glassdoor's standing to assert Doe's First Amendment rights and argued that MZ had "made a sufficient showing to entitle it to disclosure of Defendant's identity." MZ also moved to file the entire review under seal, asserting that the review "contains information that is confidential, non-public and competitively sensitive," and that "[d]isclosure of this kind of confidential information is highly detrimental to Plaintiff and would cause Machine Zone competitive and irreparable business harm by providing competitors with insight into technology development and business plans at Machine Zone."

Glassdoor opposed the motion to compel, insisting that it had standing to object and arguing that MZ had not presented adequate evidence of either a breach of the nondisclosure agreement or of resulting injury. With respect to breach, it contended that MZ had failed to establish that the review disclosed any information that was covered by the nondisclosure agreement. It emphasized that MZ had not specified which statements in the review were supposed to have revealed confidential information, nor the confidential information they supposedly revealed. It also presented evidence that some

_____

[2] We use the masculine pronoun to refer to Doe because that treatment is consistent with the fictitious name by which he is sued.

4

of the more concrete statements in the review disclosed information that was already publicly available.

The trial court granted the motion to compel. Glassdoor petitioned this court for an extraordinary writ vacating the order and directing the trial court to deny the motion. We issued a stay, followed by an order to show cause why the requested relief should not be granted.

DISCUSSION

## I. Standing

### A. State of the Law

There is no question that Doe had a right, protected by the First Amendment, to speak anonymously. (See *Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1163-1164 (*Krinsky*), citing *Talley v. California* (1960) 362 U.S. 60, 64, *McIntyre v. Ohio Elections Com'n* (1995) 514 U.S. 334, 341-342 & *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton* (2002) 536 U.S. 150, 166.) However MZ contends that Doe's First Amendment rights are personal to him and may not be erected by Glassdoor as a barrier to discovery. This contention raises a true question of *jus tertii* standing, i.e., the ability "to defeat a claim by asserting the paramount rights of a third person." (*Jasmine Networks, Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, 989-991.)

A decade ago, such a contention presented a relatively novel question. Now, however, a substantial preponderance of national authority favors the rule that publishers, including Web site operators, are entitled to assert the First Amendment interests of their anonymous contributors in maintaining anonymity. (See *Digital Music News LLC v. Superior Court* (2014) 226 Cal.App.4th 216, 228, fn. 12, quoting *Rancho Publications v. Superior Court* (1999) 68 Cal.App.4th 1538, 1541 [" 'a nonparty 'to civil litigation (such as a newspaper) [may] assert the constitutionally protected rights of an author to remain unknown' "]; *McVicker v. King* (W.D. Pa. 2010) 266 F.R.D. 92, 95 ["The trend among

5

courts which have been presented with this question is to hold that entities such as newspapers, internet service providers, and website hosts may, under the principle of *jus tertii* standing, assert the rights of their readers and subscribers."]; *In re Indiana Newspapers Inc.* (Ind. Ct. App. 2012) 963 N.E.2d 534, 549 ["when a third-party entity, such as a newspaper, is subpoenaed to reveal the identity of an anonymous commenter who has used that third party as a forum for his anonymous speech, the third-party has standing to contest the subpoena under the principle of jus tertii"]; *Pilchesky v. Gatelli* (Pa. Super. Ct. 2011) 12 A.3d 430, 437, fn. 9 [dictum; standing not raised and not subject to determination sua sponte]; *Trawinski v. Doe* (N.J. Super. Ct. App. Div., Jun. 3, 2015) 2015 WL 3476553, at p. 5; *In re Subpoena Duces Tecum to America Online, Inc.* (Va. Cir. Ct. 2000) 52 Va. Cir. 26, 2000 WL 1210372 (*AOL*), revd. on another ground in *America Online, Inc. v. Anonymous Publicly Traded Co.* (2001) 261 Va. 350 [542 S.E.2d 377]; *In re Verizon Internet Services* (D.D.C.2003) 257 F.Supp.2d 244, 257-258 (*Verizon*), revd. on another ground in *Recording Industry Ass'n. of America, Inc. v. Verizon Internet Services, Inc.* (D.C.Cir.2003) 351 F.3d 1229, 1239.)

### B. The Matrixx Decision

MZ contends that a contrary rule was adopted by this court in *Matrixx Initiatives, Inc. v. Doe* (2006) 138 Cal.App.4th 872 (*Matrixx*). But that case did not involve the standing of a publisher or service provider. The person attempting to assert the rights of the anonymous online speaker there was a deponent who *denied any connection to the offending posts*, even though one of them had been traced to a hedge fund he managed. (*Id.* at p. 876.) This made him a "third part[y] in a lawsuit that may have nothing to do with [him]." (*Id.* at p. 879.) As such, he had no right to assert the interests of "presumably unrelated third parties." (*Id.* at p. 881.) The court did not disagree with decisions, including some of those cited above, in which service providers had successfully asserted standing to defend their subscribers' First Amendment right to

6

anonymity. (*Id.* at pp. 880-881, citing *AO, supra,* 261 Va. 350 [542 S.E.2d 377]*; Verizon, supra,* 257 F.Supp.2d 244, 257-258.) Rather the court distinguished those cases on the ground that each of them had found standing in "an entity with a sufficiently close relationship to the anonymous user that judicial consideration was warranted." (*Matrixx, supra*, at p. 880.)

Glassdoor is not an avowed stranger to the speaker, as was the objector in *Matrixx*. It is the acknowledged *publisher* of the speech at issue. Such a publisher has a strong interest in protecting the right of its users to speak anonymously. Thus the court in *AOL, supra*, 261 Va. 350 [542 S.E.2d 377], observed that the service provider would be harmed by disclosure of the user's identity because " '[i]f [it] did not uphold the confidentiality of its subscribers . . . one could reasonably predict that [its] subscribers would look to [its] competitors for anonymity.' " (*Matrixx, supra*, 138 Cal.App.4th at p. 880, quoting *AOL, supra*, 52 Va. Cir. 26, 32.) Similarly, failure by the service provider in *Verizon, supra,* to protect its users' anonymity would diminish its " 'ability to maintain and broaden its customer base.' " (*Matrixx, supra*, 138 Cal.App.4th at p. 880, fn. omitted, quoting *Verizon, supra*, 257 F. Supp. 2d 244, 258.) Another court found that a newspaper had standing to defend a poster's anonymity, where "preventing [it] from asserting the First Amendment rights of anonymous commentators" on its Web site would "compromise the vitality of the newspaper's online forums, sparking reduced reader interest and a corresponding decline in advertising revenues." (*Enterline v. Pocono Medical Center* (M.D. Pa. 2008) 751 F.Supp.2d 782, 786.)

The situation here is the same as in the cases distinguished by *Matrixx*. As Glassdoor's corporate counsel declared, its business model "relies on maintaining its users' anonymity. The reliability of the information on glassdoor.com would likely decrease if litigants could readily obtain users' identities, because users would fear retaliatory litigation based on the information they posted." This would naturally tend to

7

harm Glassdoor's interests, because its usefulness to potential readers depends on the degree to which posters feel able to frankly recount their employment experiences without fear of adverse consequences. In the case of a current employee, such consequences can be severe, up to and including termination of employment. Even a past employee may be exposed to retaliation by, for instance, unfavorable references. Anonymity may provide a would-be poster's only real protection against such consequences. By providing it, Glassdoor creates an opportunity for users to safely provide content of interest to other users. In exchange Glassdoor receives content which, it hopes, will draw readers to its site and from which it undoubtedly hopes to derive revenue.

Anonymous publication thus furnishes not only the medium through which persons like Doe exercise their First Amendment rights, but is also a significant asset in Glassdoor's business—an asset in which Glassdoor possesses a direct pecuniary interest squarely aligned with the interest of each anonymous content provider.[3] This symbiosis constitutes a "sufficiently close relationship . . . that judicial consideration [i]s warranted." (*Matrixx*, *supra*, 138 Cal.App.4th at p. 880.)

### C. *"Practical Obstacles"*

Quoting *Matrixx*, *supra*, 138 Cal.App.4th at page 877, MZ contends that a third party such as Glassdoor may assert an absent party's First Amendment interests only if

---

[3] Glassdoor has not contended that it is protecting *its own* First Amendment interests in this matter, but such a contention might have considerable color if urged in a proper case. After all, Glassdoor is itself a publisher of the speech at issue and the present matter threatens to impair its ability to continue to publish speech supplied to it by anonymous content providers. In this regard its interests resemble those of a news outlet resisting disclosure of the identity of a confidential source. Its position differs only in that it does not, apparently, exercise any editorial control over the speech it publishes, acting instead as a passive conduit for the speech of others. It is far from clear that this fact should deprive it of the status of a speaker seeking to protect its own First Amendment rights.

the evidence discloses " 'some hindrance to the third party's ability to protect his or her own interests.' " The quoted requirement is one of the limitations on standing adopted by federal courts. (*Powers v. Ohio* (1991) 499 U.S. 400, 411.) It is not, however, among the *jurisdictional* constraints arising from the constitutional requirement of a "case[]" or "controvers[y]." (U. S. Const., art. III, § 2; see *Enterline v. Pocono Medical Center*, *supra*, 751 F.Supp.2d 782, 784-785; *Singleton v. Wulff* (1976) 428 U.S. 106, 115-116.) It is instead one of the *prudential* considerations intended to protect the integrity of the judicial process. As such, it is to be flexibly applied in a manner befitting its purposes, and "should not be applied where its underlying justifications are absent." (See *Singleton v. Wulff*, *supra*, 428 U.S. at p. 114.) The high court has identified two such justifications: the undesirability of triggering an unnecessary adjudication where the holder of the rights at issue "do[es] not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not," and the desirability of ensuring that the third party's interests are not represented by an inadequate advocate. (*Id.* at p. 114.)

Here the first objective does not appear to be at issue since Doe has already asserted his right to speak anonymously and Glassdoor's disclosure of his identity would effectively destroy that right. Nor do we see any reason to suppose that Doe would be a better advocate than Glassdoor. Indeed, it appears that in settings like this one, the opposite will typically be true. Several cases in similar contexts have disposed of the "hindrance" issue on the rationale that anonymous speakers cannot represent their own interests without sacrificing the very anonymity they seek to protect. (E.g., *Enterline v. Pocono Medical Center*, *supra*, 751 F.Supp.2d at p. 785; *McVicker v. King, supra,* 266 F.R.D. 92, 95-96; cf. *NAACP v. Alabama* (1958) 357 U. S. 449, 459 [association could assert right of members to remain anonymous because "[t]o require that [the right] be claimed by the members themselves would result in nullification of the right at the very moment of its assertion"].) This is a compelling argument where it is clearly true, but in

9

California the reality is more nuanced because our courts allow a speaker in Doe's position to defend the right to anonymity under a fictitious name. (E.g., *Krinsky, supra,* 159 Cal.App.4th 1154; see *Immunomedics, Inc. v. Doe, et al.* (2001) 342 N.J.Super. 160, 775 A.2d 773.) Of course, such a speaker may be unable to *physically* participate in the proceedings without betraying his or her identity, and this may be a hindrance in various respects, including the presentation of evidence. To that extent, at least, a publisher is in a better position to represent an anonymous author's interests than the author is, for it does not risk losing the anonymity at issue simply by appearing in court. (See *Enterline v. Pocono Medical Center*, *supra*, 751 F.Supp.2d 782, 785-786 [reasoning that since anonymous posters had apparently acquired their information in an "employment or other close interpersonal relationship" with the plaintiff or other involved parties, "and since disclosing the commentators' identities risk[ed] damaging these relationships, . . . [the posters] face[d] practical obstacles preventing them from personally asserting their rights"].)

Doe could of course engage counsel to appear on his behalf, but there is no reason to believe that this would yield better representation than Glassdoor will provide. Indeed, one consequence of denying standing to a publisher in Glassdoor's position would be to cast upon the anonymous speaker the potentially prohibitive *cost* of defending the right to anonymity. MZ's approach would thus result in what Justice McAdams characterized as sending mixed signals to would-be anonymous speakers: "The good news . . . [is that] your message will be protected by the First Amendment and your identity will be protected by the court quashing a third party subpoena . . . . The bad news: it may cost you tens of thousands of dollars to preserve your anonymity." (*Tendler v. www.jewishsurvivors.blogspot.com* (2008) 164 Cal.App.4th 802, 810 (*Tendler*) (conc. opn. of McAdams, J.).) There is no basis to assume that the typical online commenter has access to that kind of money. If not, and unless they can interest some charitable

10

third party in financing a defense, the denial of standing to their publishers may inflict not a mere hindrance, but a practical bar to defending their own interests.

Even where the anonymous speaker can afford to pay for a defense, the prospect of doing so can only inhibit the speech at issue. Most content providers like Doe are unlikely to receive, and do not expect to receive, any economic reward for the content they provide. MZ's rule would require them to decide whether to engage in an activity creating a significant risk of substantial pecuniary harm while offering no prospect of material reward. The prudent decision is to refrain from posting. From this perspective the publisher may have a greater interest in the right of anonymity than its contributors do, for they have the option of simply declining to speak—a decision that directly injures the publisher's business. If the publisher is prepared to ameliorate this inhibiting effect by stepping into its contributors' shoes when their anonymity is threatened, we see no sound reason to forbid it. Denial of that right would serve neither the purposes of prudential standing requirements nor the broader interests of a society devoted to the free flow of ideas and information.

Of course the right to speak anonymously is not an unalloyed good. Anonymity can facilitate various kinds of harmful speech, including defamation, wrongful disclosure of private information, and malicious disinformation. But we are here concerned with the threshold question whether *jus tertii* standing is justified by the inhibitory effect of burdening anonymous speakers with the cost of preserving their anonymity before any assessment of wrongfulness has been made. Indeed, in its present posture it cannot even be assumed that a suit such as this one was filed in the reasonable *belief* that the speech was wrongful, or with the reasonable hope of prevailing. As Justice McAdams observed in *Tendler*, *supra*, 164 Cal.App.4th at page 812 (conc. opn. of McAdams, J.), "[s]ome requests" for disclosure of a poster's identity "will be based on a legitimate right to discover the source of libelous statements or business disinformation schemes; but some

11

will be solely for the purpose of silencing a critic by harassment, ostracism, or retaliation." We would go further and suggest that some attacks on anonymity may be mounted for their *in terrorem* effect on *potential* critics. Here, for instance, such a suit might be intended to deter other past or present employees from criticizing MZ—an effect that would violate the public policy manifested in California statutory law, which prohibits employer restrictions on, or punishment for, speech regarding conditions of employment. (Lab. Code, § 232.5.) The message conveyed to such would-be speakers by the rule MZ advocates is the one articulated by Justice McAdams: that they may be entitled to engage in anonymous criticism, but only if they are prepared to pay a significant sum—or, as he says, "tens of thousands of dollars"—to prevent disclosure of their identities. (*Tendler*, *supra*, at p. 810 (conc. Opn. of McAdams, J.).) We do not believe such a regime strikes the right balance between the interests of the anonymous speaker and those of the allegedly aggrieved subject of the speech.

We conclude that Glassdoor has standing to assert John Doe's interest in maintaining his anonymity as against Machine Zone's efforts to compel Glassdoor to identify him.

## II. Standard of Review

Both parties treat our decision in *Krinsky*, *supra*, 159 Cal.App.4th 1154, as providing the proper analytical framework for determining whether MZ is entitled to discover Doe's identity. As we there observed, disputes of this kind are governed by a tripartite standard of review. We review the trial court's order independently insofar as it rests on undisputed facts. (*Id.* at p. 1161.) We also determine independently the scope of First Amendment protection to be accorded to the speech upon which the plaintiff's claim is predicated. (*Id.* at pp. 1161-1162.) We defer to the trial court's findings of fact on non-constitutional questions so long as they are supported by substantial evidence. (*Ibid.*)

12

### III. *The Krinsky Requirements*

In *Krinsky*, an officer of a Florida corporation brought suit for libel and interference with advantage against the anonymous authors of "scathing" posts on a financial message board. (*Krinsky, supra,* 159 Cal.App.4th at p. 1158.) To determine their identities, she subpoenaed records from the service provider who hosted the board. The trial court ordered disclosure, and one of the anonymous posters petitioned this court for a writ. After reviewing various approaches adopted by other courts in similar situations, we concluded that the plaintiff had to satisfy two requirements to overcome the defendant's constitutional right to preserve his or her anonymity. First, if the defendant has not received notice of the attempt to lift the shield of anonymity, the plaintiff must make reasonable efforts to provide such notice. (*Id.* at p. 1171.) Second, the plaintiff must "make a prima facie showing that a case for defamation exists" (*ibid.*; see *id.* at p. 1172), by "setting forth evidence that a libelous statement has been made" (*id.* at p. 1172, fn. omitted). We described the required quantum of evidence as " 'that which will support a ruling in favor of [the plaintiff] if no controverting evidence is presented. [Citations.] It may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences. [Citation.]' " (*Id.* at p. 1172, fn. 14, quoting *Evans v. Paye* (1995) 32 Cal.App.4th 265, 280, fn. 13.)

Although the present case does not sound in libel, we see no reason to doubt that the same principles apply. In any action predicated on anonymous speech, regardless of legal theory, the plaintiff should not be able to discover the speaker's identity without first making a prima facie showing that the speech in question is actionable. Here this means a prima facie showing that Doe's review contained statements that had the effect of disclosing confidential information, as defined by the nondisclosure agreement. The showing must be sufficient to "support a ruling in favor of [MZ]." (*Krinsky, supra,* 159

13

Cal.App.4th at p. 1158, fn. 14, quoting *Evans v. Paye, supra* 32 Cal.App.4th 265, 280, fn. 13.)

### IV. *Specification of Actionable Statements and Their Alleged Meanings*

In addition to the requirements laid out in *Krinsky*, we believe it is necessary to require that a plaintiff seeking to discover the identity of an anonymous speaker first clearly specify the statements claimed to be actionable, state the actionable meanings assertedly conveyed by them, and set forth, if necessary, evidence sufficient to sustain a finding that the statements were capable of conveying those meanings. As we noted in *Krinsky*, at least one court had adopted a rule requiring the plaintiff to "set forth the specific statements that are alleged to be actionable." (*Krinsky, supra,* 159 Cal.App.4th at p. 1167, citing *Dendrite International Inc. v. John Doe No. 3* (2001) 342 N.J.Super. 134, 775 A.2d 756; see also *Quixtar Inc. v. Signature Management Team, LLC* (D. Nev. 2008) 566 F.Supp.2d 1205, 1216, fn. omitted ["Plaintiff should not be afforded discovery regarding the identity of any anonymous author where the exact statement at issue has not been put into evidence"].) Another court, we observed, had deemed such a requirement superfluous because, under the law of that jurisdiction, the offending statements in a libel case "must be quoted in the plaintiff's complaint." (*Krinsky, supra,* at p. 1169, citing *Doe v. Cahill* (Del. 2005) 884 A.2d 451, 461.) In defamation cases California follows a similar pleading rule, under which "the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint." (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1612, fn. 5; see *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1017, fn. 3; *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 31-32 [description of allegedly defamatory statements was "a paradigm of vagueness, and does not even come close to the specificity required to state an actionable libel claim"]; 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 739, p. 159 ["the complaint should set the matter out verbatim, either in the body or as an attached exhibit"].)

14

However, we were not called upon in *Krinsky* to consider whether the defendants had been adequately apprised of the statements to which the plaintiff objected. We therefore did not discuss such a requirement beyond acknowledging that it had been imposed elsewhere. Here, in contrast, Glassdoor repeatedly complained of MZ's failure to clearly identify the language it claims is actionable, and MZ steadfastly refused to do so, at least on the record, until it filed its return in this court. In an e-mail sent nine days before MZ filed its motion to compel, Glassdoor's counsel wrote, "as I noted in our call, Glassdoor remains uncertain as to which specific statements in the review at issue disclosed confidential information that is precluded from disclosure by the Confidentiality Agreement, and neither your e-mail below nor Mr. Esmail's declaration makes clear which statements are at issue." Later in the same message he wrote, "Please let me know which particular statements in the review Machine Zone believes to contain information subject to the Confidentiality Agreement." Counsel for MZ declared below that he had responded to the foregoing entreaties with an email which quoted "the statements at issue in Machine Zone's breach of contract claim." But while he described some aspects of the message and purported to summarize some of its contents, his recapitulation did not include any quotations of allegedly actionable statements.

We do not believe a plaintiff in MZ's position is entitled to compel the disclosure of an anonymous poster's identity without first clearly identifying, on the record, the specific statements claimed to have given rise to liability. It is not sufficient—if in fact it is true—that MZ identified the challenged statements in communications with opposing counsel. It is the court, not counsel, that must determine whether a prima facie showing of actionable statements has been made. It is impossible to perform such a task without knowing the exact statements on which liability is predicated. Moreover, if it is not obvious from the face of the statements that they indeed conveyed an actionable meaning, the plaintiff must clearly specify the meaning it contends was conveyed by them, and any

15

extrinsic facts necessary to lend them that meaning—the equivalents, respectively, of what are known in defamation as the "innuendo," or defamatory gist or sting, and the "inducement," or factual context necessary to render facially neutral words defamatory. (See 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 555, pp. 811, 812.)

MZ's entire showing of a disclosure of confidential information consisted of the following averments by one of its in-house attorneys: "[T]he review disclosed the scope of Machine Zone's investment in proprietary technology Machine Zone is developing for use outside of its public product, [Game of War]. The review disclosed information concerning the development stage of that technology. It also disclosed the number of personnel working on that project. The review also contains certain quotes and statements attributed to Machine Zone's CEO which, while not literally accurate in all respects, do disclose confidential aspects of the Company's expectations for the team working on Machine Zone proprietary technology, the value of the technology and the motivations for developing that technology."

These averments were too vague and conclusory to satisfy MZ's burden of making a prima facie case of a breach of the nondisclosure agreement. They are far less specific than averments that have elsewhere been found insufficient to sustain the analogous contention that a defendant has misappropriated a trade secret. (See *In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 305 et seq; *Cypress Semiconductor Corp. v. Maxim Integrated Products, Inc.* (2015) 236 Cal.App.4th 243, 263 (*Cypress*).) The lack of specificity cannot be justified, as MZ suggested below, by the supposed sensitivity of the information in question. As counsel for Glassdoor points out, MZ could have sought leave to file such materials under seal, as it did with the review itself. Any notion that a specification of objectionable statements was too sensitive to be entrusted to a sealed court record is belied by counsel's professed communication of such a specification to opposing counsel by e-mail.

16

The vagueness with which MZ framed its claims in the face of Glassdoor's repeated demands for specificity is redolent with the possibility that greater specificity might disclose not valuable secrets but a lack of merit in the claims themselves. In *Cypress*, we described approvingly another case holding that "a party was not entitled to describe a trade secret so vaguely as to amount to an open-ended work in progress." (*Cypress*, *supra*, 236 Cal.App.4th at pp. 270-271, citing *Perlan Therapeutics, Inc. v. Superior Court* (2009) 178 Cal.App.4th 1333, 1350.) Yet that is precisely what MZ did here.

After not revealing the substance of its claims, MZ added insult to injury by accusing Glassdoor of "fail[ing] to understand the confidential information at issue" and "miss[ing] the point" MZ had itself not identified. At the hearing on the motion to compel, after counsel for Glassdoor noted that the only specific technology mentioned in the review was a matter of public record, counsel for MZ responded, "[T]here are things that are in that post that are confidential that are different than what he was just talking about. Many things . . . . [T]he fact that they don't appreciate what is confidential in there doesn't mean it's not our confidential information."

The trial court tolerated this approach apparently because, once MZ moved to place the entire review under seal, both attorneys were barred from disclosing any part of its contents except under seal. (See Cal. Rules of Court, rule 2.551(c).) This provided grounds for MZ's attorney to proclaim a "big problem" with Greendoor "throwing around statements from the posting," leading to an admonition from the court that "[t]here's the whole issue of sealing, so be careful with that." The court followed up in its written order, chastising Glassdoor for a "cavalier attitude about violating the Rules of Court by quoting the contents of a document that is the subject of a motion to seal." Yet the only specific statements alluded to at the hearing closely paralleled public reports concerning MZ's "language translator" and financing efforts. As MZ has finally revealed

17

to this court, those statements are not claimed to constitute confidential information. Nonetheless, MZ has cited the trial court's admonition to us as part of an ad hominem attack on Glassdoor.

This was an intolerable mode of proceeding. In the first place, the request to seal the review—and the order granting it—swept far too broadly. Much of Doe's review obviously implicates no confidential information, describing such conditions of employment as workload, office sizes, perquisites of employment, and "work-life balance." MZ correctly concedes that employees are entitled by statute to publicize their complaints about such matters. (See Lab. Code, § 232.5.) The record therefore provided no basis to seal the review in its entirety, nor for the trial court's boilerplate findings that the sealing order was "narrowly tailored" and that "[n]o less restrictive means exist[ed] to achieve and further Machine Zone's interests in the confidential information." (See Cal. Rules of Court, rule 2.551(a)(4), (5); *H. B. Fuller Co. v. Doe* (2007) 151 Cal.App.4th 879, 894-899; *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1216-1218; *Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501, 510 [findings in support of closed proceedings must identify "overriding interest" justifying the closure].) Nor did the court appear to take note of the requirements that a sealing order "(A) Specifically state the *facts that support the findings*; and [¶] (B) Direct the sealing of *only those documents and pages, or, if reasonably practicable, portions of those documents and pages, that contain the material* that needs to be placed under seal. All other portions of each document or page *must* be included in the public file." (Cal. Rules of Court, rule 2.550(e)(1), italics added.)

The combination of MZ's refusal to specify its claims and its grossly overbroad motion to seal rendered it almost impossible for Glassdoor to effectively defend against the subpoena other than by protesting, as it did, that the very vagueness of MZ's showing precluded an order compelling the requested discovery. A party to litigation is entitled to

18

adequate notice of the issues he or she must meet in order to vindicate his or her interests. To refuse to specify one's claims while barring their target from even stating what he or she understands them to be suggests less the American tradition of notice and opportunity to be heard than the trial described by Franz Kafka, where Joseph K. is arrested and told to report to court, neither the date or the charge is made known to him. He finds a clerk in a crowded upstairs room, there are no signs, and he never sees the judge.

In the similar context of trade secret litigation, the plaintiff is required by statute, prior to the commencement of discovery on the merits, to "identify the trade secret with reasonable particularity subject to any orders that may be appropriate under Section 3426.5 of the Civil Code."[4] (Code Civ. Proc., § 2019.210.) This requirement serves a fourfold purpose: " 'First, it promotes well-investigated claims and dissuades the filing of meritless trade secret complaints. Second, it prevents plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets. [Citations.] Third, the rule assists the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope. [Citations.] Fourth, it enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation.' " (*Advanced Modular Sputtering, Inc. v. Superior Court* (2005) 132 Cal.App.4th 826, 834, quoting *Computer Economics, Inc. v. Gartner Group Inc.* (S.D.Cal. 1999) 50 F.Supp.2d 980, 985.) All but the second concern are equally applicable in the present context, and that factor too has a parallel in that such a

---

[4] The cross-referenced statute, which is part of the Uniform Trade Secrets Act, requires the trial court to "preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval." (Civ. Code, § 3426.5.)

requirement discourages the use of the litigation process for a collateral advantage or purpose, such as punishing critics or intimidating potential critics.

For the foregoing reasons, MZ's showing before the trial court fell well short of establishing a prima facie case against Doe for violation of the nondisclosure agreement. We do not rest our disposition on that fact, however, for two reasons. First, before today no California court has held that a party in MZ's position is obliged to specify the statements complained of and the circumstances making them actionable. Second, in its filings in this court MZ has finally identified the statements it claims to be actionable and the confidential information it claims they disclosed. As will appear, we have concluded that the statements thus identified have not been shown to be capable of bearing the meaning MZ attributes to them.

## V. *Prima Facie Showing*

### A. *Introduction*

We turn to the question whether MZ has made a prima facie showing that Doe's review violated the nondisclosure agreement attached to the complaint.[5] It provides in relevant part as follows: "<u>Confidentiality Obligations</u>. In the course of my Company employment, I will learn of or have disclosed to me various 'Confidential Information'. Confidential Information is any information designated or labeled as 'confidential' or 'proprietary' or which is of the type one would reasonably expect a business to maintain

---

[5] We have not overlooked *Krinski*'s requirement that efforts be made to notify the speaker of the attempt to discover his or her identity. The issue receives little attention from the parties, and no declaration was submitted to establish the fact of notice. However the record includes an e-mail exchange in which counsel for Glassdoor told counsel for MZ that Doe had been notified. Since neither party contests the point—and since John Doe can suffer no prejudice in light of our disposition—we treat it as established that he received adequate notice.

Glassdoor also contends that MZ failed to make a prima facie showing it was damaged by Doe's review. We find it unnecessary to address this contention.

20

in confidence.  During and after the term of my employment, I will not disclose to any 'unauthorized persons,' or use for any 'unauthorized purposes,' any Confidential Information which I learn or receive in connection with my employment without the written consent of an officer of Company.  These duties do not apply to Confidential Information which is or becomes publicly known through no action or fault of my own . . . ."  (Fns. omitted.)

A footnote gives examples of information covered by the agreement: "Confidential Information includes, for example, technical information such as know-how, formulae, computer software, logic design, schematics, and manufacturing processes; business information such as information about costs, prices, profits, markets, sales, customers, and vendors; personnel information such as evaluations, salary and compensation data, and private phone numbers; and information relating to innovative activities, such as inventions, research projects, plans for future development, and patent strategy.  Confidential Information includes confidential or proprietary information of a third party to which Company owes a duty of confidentiality or non-use and may also include Work Product (as defined below).  Although certain information or technology may be generally known in the relevant industry, the fact that Company uses it, and how Company uses it, may not be known, and is therefore Confidential Information."

We may assume for present purposes that if Doe's review disclosed any information covered by the agreement, the disclosure was for unauthorized purposes, and was made to unauthorized persons.  The question as thus framed is, did MZ made a prima facie showing that Doe's review disclosed information falling within the above provisions?  This query breaks down into four subsidiary questions:  First, what language in the review is alleged to have violated the agreement?  Second, what information is alleged to have been disclosed by that language?  Third, what showing has been made

21

that such information was actually conveyed to readers?  And fourth, what showing has been made that the information thus disclosed fell within the terms of the agreement?

### B.  Alleged Disclosures

#### 1.  **Existence of Platform Tea**m

Although MZ failed in the trial court to adequately specify the allegedly actionable statements (see pt. IV, *ante*), it has been more forthcoming in its filings in this court, in which it states that the offending statements are those referring to MZ's "platform team." Doe made three such statements:

"Terrible work-life balance, except for *the platform team, which do not know what to work on*."

"The senior management lost directions. *The company has invested heavily in the platform team (there are 70-80 engineers).*  However, after one year, *nothing has been done by that team*."

"The CEO said in the team meeting: *I don't expect products and revenue from the platform team. I only want you can show demos.  The platform is only for attracting investments from VCs*."  (Italics added.)

According to MZ, these statements revealed that MZ was in the process of developing a technology which was then unknown to the world but which it has now unveiled as "a real time data transmission platform branded RTplatform™."  Prior to its "rebrand[ing]," it asserts, its "public-facing business had been solely mobile gaming apps.  But on April 4, 2016, Machine Zone publicly announced that it had developed a stand-alone real-time platform technology that enables the exchange of data between billions of endpoints worldwide virtually simultaneously."  It is this new "real-time platform technology," according to MZ, that Doe prematurely disclosed by his statements about MZ's "platform team."

22

The first problem with this contention is that MZ presented no evidence that Doe's mere allusions to a "platform team" would tell readers anything about a "real time data transmission platform" or a "stand-alone real-time platform technology." In the absence of such evidence, it is impossible to see how a trier of fact could find that the review actually conveyed the meaning MZ attributes to it. As used in the computing world, "platform" appears to be a term of great generality and flexibility, with a wide range of meanings that vary with context. (See Computing platform – Wikipedia, the free encyclopedia <https://en.wikipedia.org/wiki/Computing_platform> (as of Mar. 8, 2017).) In the context of computer hardware, "platform" refers to the "[h]ardware environment that supports the running of a computer system." (Glossary of Computer Related Terms, <http://www.math.utah.edu/~wisnia/glossary.html#p> (as of Mar. 8, 2017); see Supported Operating System and Hardware Platform Combinations <http://cng.seas.rochester.edu/CNG/docs/supported.html> (as of Mar. 8, 2017).) But the term can refer to either "hardware or software used to host an application or service." (What is platform? – Definition from WhatIs.com, <http://searchservervirtualization.techtarget.com/definition/platform> (as of Mar. 8, 2017).) "Platform" has elsewhere been used to describe "a common set of core assets" to be utilized by a "family of products." (Platform engineering | Decision Driven® Solutions Blog <https://decisiondriven.wordpress.com/2008/06/11/platform-engineering/> (as of Mar. 8, 2017).) One major technology company describes its platform as the "infrastructure to power our own products and services." (The Google Cloud Platform Team: rebuilding Google technology to power the world – Google Careers <https://www.google.com/intl/en/about/careers/lifeatgoogle/chris-elliott-cloud-platform.html> (as of Mar. 8, 2017).) And in the specific context of computer gaming, online examples are readily found where "game platform" or "gaming platform" refers to a hardware or software environment in which games may be run. (See, e.g., Steam, The

Ultimate Online Game Platform <http://store.steampowered.com/about/> (as of Mar. 8, 2017); Online Gaming Platform – iCore <http://www.comtradegaming.com/online-gaming-platform-icore/> (as of Mar. 8, 2017); Gameforge Live | Online Gaming Platform <http://gfl.gameforge.com/> (as of Mar. 8, 2017); Comparison of gaming platforms - Wikipedia <https://en.wikipedia.org/wiki/Comparison_of_gaming_platforms> (as of Mar. 8, 2017).)

We do not cite these web pages as affirmative evidence of the understanding a reader would actually form based on Doe's use of the term "platform." Rather they serve to highlight MZ's critical failure to make any showing on that subject. The record provides no basis whatever for a finding that Doe's mere allusions to a platform team would tell the public anything more than that a group of MZ workers were charged with developing the infrastructure for future games, or perhaps for some application or family of applications of unknown type. We fail to see how this vague information could be news, let alone competitively advantageous, to any student of the industry. It was incumbent upon MZ to make a showing sufficient to sustain a finding that Doe's references to a "platform team" conveyed confidential information to persons outside the company. No such showing appears.

Further, it was hardly a secret that MZ was working on some sort of "platform." Glassdoor presented a job listing, apparently posted by MZ less than three weeks after Doe's review appeared, in which MZ advertised for a "Senior Machine Learning Engineer" to be assigned to "Machine Zone's *platform group*." The group was said to be engaged in "creating the next generation *communication platform* where *players* from around the world communicate seamlessly in real-time and across languages." (Italics added.) Web archives indicate that MZ had been advertising publicly for positions in the areas of "Data Platform" and "Platform Engineering" since at least June 2014—a full year before Doe posted his review. (Careers | Machine Zone (Jun. 5, 2014)

24

<https://web.archive.org/web/20140605200645/http://www.machinezone.com/careers/> (as of Mar. 8, 2017).)[6]

MZ obliquely suggests that Doe disclosed the supposedly confidential fact that MZ's platform technology would have "a variety of applications beyond gaming." Again, we see nothing in the review that would convey such an intimation to readers, but in any event MZ made no secret of its intention to extend its technology beyond gaming. A savvy reader could infer such an intention at least as early as August 2013, when CEO Leydon, in an interview discussing an early version of Game of War, described its multiplayer, multilingual technology in terms that could easily suggest applications outside the gaming world.[7]  In a March 2015 interview, some three months before Doe's review, Leydon was quite explicit about this potential, describing this feature of the game

---

[6] We asked the parties to address the question whether this court might and should take judicial notice of the cited webpage and those discussed below. Both parties answered that question affirmatively.

[7] "When we were building the server infrastructure to handle a lot of players, the translation came out of the problem of having all of these players together from all over the world with the need to communicate. When you're able to *connect all of these people together in a real-time environment* where communication is just so important, it became obvious that if we were going to put everyone into this one environment, we were going to have issues if they couldn't talk to each other.  [¶]  . . . [¶]  . . .  [I]t got to the point where, during the beta, we had problems where it shutdown because of a bug and people would freak out because *they couldn't talk to their friend anymore.  That was the light-bulb moment.  When people were relying on it to talk to their friends, friends that they couldn't have any other way, that's when I realized how very necessary this really is*. . . . [¶]  . . . [¶]  . . . *Our goal is to network all of those people together, networking all of the like-minded people together into one place.  If you think about it, that's a really powerful thing, that's an incredible amount of leverage.*  Normally, if I have a Polish player who is really into this game, I'd have to go out and build a Polish server and fill it with Polish people for him to play with.  Game of War doesn't have to do that.  That's a really powerful thing.  Hopefully we can network all of these like-minded people together into one place." (Insider Q&A: Machine Zone's Gabriel Leydon | SocialTimes (Aug. 6, 2013) <http://www.adweek.com/socialtimes/insider-qa-machine-zones-gabriel-leydon/541576?red=im> (as of Mar. 8, 2017).)  (Italics added.)

25

as " 'closer to a social network than it is a video game' " and as " 'the largest real-time concurrent interactive application ever built,' " adding, " 'There's nothing even close to it.' " (One Nerd to Rule Them All (With Lots of Kate Upton) - Bloomberg Business (Mar. 5, 2015) <http://www.bloomberg.com/graphics/2015-game-of-war/> (as of Mar. 8, 2017).) The article described Leydon as "intend[ing] to focus on what his new networking technology can accomplish outside the gaming world. He says dozens of companies have asked to license Machine Zone's translation engine. *Its applications, he says, span beyond gaming and into finance, logistics, social networking, and data analysis.* [¶] 'We're a technology company,' he says. 'We're not really a game company. *What we accomplished here is actually where we're going next. Getting so many devices to participate in the same experience at the same time—that's going to be the most important part of the business.*' " (One Nerd to Rule Them All (With Lots of Kate Upton) - Bloomberg Business (Mar. 5, 2015) <http://www.bloomberg.com/graphics/2015-game-of-war/> (as of Mar. 8, 2017), italics added.) These statements led at least one industry commentator to speculate on specific non-game applications for the technology. (Machine Zone (MZ) : A $4 Billion Dollar Unicorn That Walks The Walk (Mar. 24, 2015) <http://glomoinvesting.com/machine-zone-the-4-billion-unicorn-that-walks-the-walk/> (as of Mar. 8, 2017.)

In sum, the record contains no support for a finding that Doe's mere references to a "platform team" would tell the public anything it had not heard from MZ's own CEO.

### 2. Size of Team

MZ emphasizes Doe's statement that "[t]he company has invested heavily in the platform team (there are 70-80 engineers)." While it may be possible that this was confidential business information, MZ again failed to present any evidence to that effect. This is more than a technical point, for it is also possible that this or equivalent information was accessible to the public by, for instance, monitoring MZ's job listings.

26

(See *Cypress, supra,* 236 Cal.App.4th 243, 250-251, 253, 263.) It is conceivable that the size of the team, coupled with some other knowledge, would tell readers something that was not yet publicly known. However, if that is the case, MZ failed to demonstrate it. Accordingly, MZ failed to make a prima facie showing that Doe breached the nondisclosure agreement by alluding to the number of engineers on the platform team.

### 3. CEO Statements

An in-house attorney for MZ declared that Doe's review "quoted Machine Zone CEO Gabriel Leydon's confidential internal statements concerning th[e undisclosed] technology." It is true that the review purported to quote or paraphrase two statements made by the CEO concerning his expectations for the platform team. But again those statements appear to reveal nothing about any "undisclosed technology." Doe apparently meant to portray the CEO as less interested in actual progress than in projecting the *appearance* of progress to potential investors. Given the tenor of Doe's depiction, it is no surprise that MZ's declarant described Doe's account as "not literally accurate in all respects." Because this suggests that the statements were false, at least in part, we asked the parties to brief the question whether Doe's review could be found to violate the nondisclosure agreement if "(1) the report did not accurately recapitulate those statements, or (2) the statements as reported did not accurately describe Machine Zone's internal policies or other information covered by the nondisclosure agreement?"

MZ's response to this query does not meet our question. Here again is what Doe wrote: "The CEO said in the team meeting: I don't expect products and revenue from the platform team. I only want you can show demos. The platform is only for attracting investments from VCs."[8] And here is MZ's description of that sentence: "He also revealed internal discussions that Mr. Leydon did not 'expect products and revenue from

---

[8] By "VCs," Doe undoubtedly meant suppliers of venture capital.

27

the platform team,' but instead *saw the technology as a key investment* for the company, urging the platform team to *focus on scaling up the technology* to 'show demos' of RTplatform's™ full capabilities *rather than rolling out and attempting to monetize the technology piecemeal.*" (Italics added.) According to MZ, Doe's statements also "informed readers that . . . the platform team had not yet developed a saleable product or achieved revenues (disclosing the project's stage of development)," and "gave industry rivals inside knowledge on the speed and manner of the RTplatform™ development . . . ."

It is unclear what MZ means by this wholesale rewriting of Doe's statements. It might be understood as an attempt to describe what MZ believes was *conveyed* by Doe's actual words—the equivalent of the innuendo in defamation. If so it fails because the record supplies no basis to believe that a reader of Doe's review would understand it to mean what MZ says it means. Doe said nothing about RTplatform, monetization, revenues, or key investments. Or perhaps MZ's revised version of Doe's statements is a description of what it contends the CEO *actually said*. If so, the divergence between the statements attributed to him by Doe and those attributed by MZ only sharpens the point we asked MZ to address: Can a *false* report of internal company dealings violate a nondisclosure agreement?

The gist of Doe's account was that whatever the platform team was working on, the CEO told its members to focus their efforts on creating demos to assist in raising venture capital. Doe may have intended to accuse the platform team of generating—and the CEO of ordering it to generate—"vaporware," i.e., "[a] piece of software or other product for use in computing which, despite being publicized or marketed, either does not exist or has not (yet) been developed commercially." (vapourware | vaporware, n.: Oxford English Dictionary, <http://www.oed.com/view/Entry/243248> (as of Mar. 8, 2017); see 2 New Shorter Oxford English Dict. (3d ed. 1993), p. 3546 ["software that as

28

yet exists only in the plans of publicity material of its developers"].)  This is consistent with Doe's statements—not cited by MZ as violations of the disclosure agreement—that "Management spreads unreal information to both outside VC's and employees," that everyone is working too hard "except for the platform team, which do not know what to work on," that "senior management" has "lost direction[]," and that MZ was guilty of "telling the investors and employees the unreal information" and of "cheating."

Subsequent events suggest that Doe's interpretation of MZ's actions and motives was simply wrong.  MZ was indeed developing a new product, which it launched—together with a repackaging of its corporate image and mission—a mere 10 months after Doe accused it of accomplishing nothing of substance.  The question thus remains: Insofar as an employee's statement about an employer's internal activities is *untrue*, can it ever violate a nondisclosure agreement?  We think the answer is obviously negative. The essence of "information," as that term is used in this context, is "*Knowledge communicated* concerning some particular *fact, subject, or event*; that of which one is *apprised or told*; *intelligence, news*."  (7 Oxford English Dict. (2d ed. 1989), p. 944, italics added.)  Similarly, "confidential" means *imparted* in confidence, i.e., with the expectation that the matter communicated will not be further disclosed.  "Confidential" is derived from "confide," which means to "*[t]ell* someone about a secret or private matter while trusting them not to repeat it to others."  (confide - definition of confide in English | Oxford *Living* Dictionaries <https://en.oxforddictionaries.com/definition/confide> (as of Mar. 8, 2017), italics added.)  The agreement here clearly used these terms in this sense; the confidentiality provision opens with the recital, "In the course of my Company employment, I will *learn of or have disclosed to me* various 'Confidential Information.' "

In sum, confidential information consists of *facts* that have been *communicated* with an expectation of nondisclosure.  False statements do not convey "facts" or "knowledge," but the opposite.  Their contents are not "learn[ed]" or "disclosed," but

29

born of error, or perhaps malice, in the speaker's own mind. If Doe had stated that MZ was laundering funds for a criminal syndicate, MZ might have a tort claim; but it would not have a claim for disclosure of confidential information unless the company was, in fact, laundering funds.

This is not to suggest that an employee can defeat such a suit merely by showing that his or her statements were in some part untrue. It is possible for a statement to be false in part but still to convey true information, and if the information thus conveyed is confidential, the statement can be found to violate a nondisclosure agreement even if it is in some respects false. Here, however, MZ has never attempted to separate the portions of Doe's review that are "not literally accurate in all respects" from those that might have conveyed true, and confidential, information. An employer cannot establish a claim for breach of a nondisclosure agreement unless it is prepared to prove, and does prove, that the defendant disclosed *actual* confidential information, i.e., that his or her statements were, in some relevant degree, true.[9] Nothing in this record would sustain a finding that the CEO's statements—reported by Doe inaccurately, according to MZ—had this effect.

MZ's hesitation on this point may be understandable, because Doe's supposed disclosures do not cast MZ in a favorable light. But MZ cannot be excused from the requisite showing merely because proving a prima facie case might be embarrassing to it. If Doe accurately disclosed company policy, or the CEO's statements regarding that policy, it was incumbent upon MZ to present evidence to that effect. Instead it *denied* the accuracy of Doe's report without identifying any real confidential information it might be

_____

[9] After all, the function of a nondisclosure agreement is to prevent competitors from learning the company's actual *secrets*. Information that falsely represents the company's activities may inflict some other kind of injury such as damage to the company's reputation, but it is difficult to see how it would diminish the competitive advantage of secrecy. From a competitive standpoint, it would seem if anything to constitute disinformation on which competitors would rely at their peril.

30

understood to have disclosed. MZ therefore failed to establish a prima facie case predicated on Doe's account of the CEO's statements.

**DISPOSITION**

MZ has failed to make a prima facie showing that anything in Doe's review disclosed confidential information in violation of the nondisclosure agreement. Let a peremptory writ issue directing respondent court to set aside its order of September 15, 2015, and issue a new order denying the motion to compel. Glassdoor will recover its costs.

_____

                             RUSHING, P.J.

WE CONCUR:

_____

               PREMO, J.

_____

               GROVER, J.

*Glassdoor, Inc. v. Superior Court* (*Machine Zone, Inc.*)
**H042824**

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court |
| | Court No.: CV282558 |
| | |
| Trial Judge: | The Honorable |
| | Mary E. Arand |
| | |
| Attorneys for Petitioner | Seubert French Frimel & Warner LLP |
| Glassdoor, Inc.: | |
| | William J. Frimel |
| | Rebecca L. Epstein |
| | |
| Attorneys for Real Party in Interest | Arnold & Porter LLP |
| Machine Zone, Inc.: | |
| | Michael A. Berta |
| | Sean M. SeLegue |
| | |
| | Sean Morris |

*Glassdoor, Inc. v. Superior Court (Machine Zone, Inc.)*
**H042824**